**Milton C. JACKSON, Syndicate Manager,**
v.
**UNITED STATES.**

**SOUTHERN TRADING COMPANY, by Milton C. Jackson, Receiver,**
v.
**UNITED STATES.**

Nos. 389–55, 261–57.

United States Court of Claims.

Jan. 15, 1958.

As Amended April 2, 1958.

Charles H. Vaughn, Washington, D. C., for plaintiff.

Justin S. Colin, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Stephen C. Bransdorfer, Washington, D. C., was on the briefs.

MADDEN, Judge.

In each of these two suits Milton C. Jackson sues in a different representative capacity. The asserted causes of action in the two suits are identical, each being based upon the same transactions between Southern Trading Company and the United States Maritime Commission and its successor agency, the United States Maritime Administration. The plaintiff could not, of course, recover in both suits. We find it unnecessary to consider the differences between the two suits, since we have concluded that the statute of limitations is a bar to the cause of action upon which both suits are based.

The word plaintiff as used in this opinion will refer to either Southern Trading Company or Milton C. Jackson, as the context indicates. Southern Trading Company bought five T–2 tankers from the Maritime Commission in 1947 and 1948. The sales were made pursuant to the Merchant Ship Sales Act of 1946, 60 Stat. 41, 50 U.S.C.A.Appendix, § 1735 et seq. Discussion of the history and purposes of that statute appears in this court's decisions in A. H. Bull Steamship Co. v. United States, 123 Ct.Cl. 520, and Southeastern Oil Florida, Inc., v. United States, 119 F.Supp. 731, 127 Ct.Cl. 409, certiorari denied 348 U.S. 834, 75 S.Ct. 56, 99 L.Ed. 658. Upon the sale of the ships, the Maritime Commission required the purchaser, Southern, to pay to the Commission $28,875 on account of each of the ships on account of "slotting and strapping" the ships, and as to some of the ships, to pay other sums on account of repairs which the Commission had had made to the ships shortly before their sale. As we shall see, the Commission later repaid some of this money to the plaintiff. The instant suits are for the recovery of the rest of the money.

The money here in question was paid by the plaintiff to the Commission in 1947 and 1948. The instant suits were filed, one in 1955 and one in 1957. The plaintiff asserts that the Ship Sales Act gave the Commission no right to charge purchasers with the cost of slotting and strapping, and we so held in Southeastern Oil Florida, supra. The plaintiff makes the same contention as to the repair charges which it seeks to recover. The Government says that if the charges were wrongful when made, the plaintiff's cause of action arose at that time and hence was barred by the statute of limitations when the suits were filed.

The plaintiff says that the Commission did not wrongfully receive the money in 1947 and 1948, because it received it only as a deposit of security for the payment of such sum, if any, as the Commission might later determine should be charged to the purchaser.

At the time of the sales here involved, the Commission had taken the position that the slotting and strapping of this type of tankers constituted an additional "desirable feature" over and above what the purchaser of such a ship was entitled to get, and hence the purchaser should pay an extra amount for it. How much it would actually cost to have the work done could only be estimated. The estimate of the Commission's staff was $28,875 per ship. There was doubt as to whether the purchaser should be charged the current cost of the work, or only what the work would have cost if it had been done when the ship was built. There was also a problem as to whether this cost should be depreciated, as the price of the ship was depreciated.

The Ship Sales Act provided that money received by the Commission on the sale of ships should be deposited in the Treasury to the credit of miscellaneous receipts. Purchasers of ships objected to making such payments as are discussed above because, once the money got into the general funds of the Treasury, the Commission would not have the authority to refund to them any amounts to which they might later be determined to be entitled. An arrangement was worked out by the Commission and the General Accounting Office whereby these funds were deposited in an account in the Treasury entitled "Unearned Moneys, Merchant Ship Sales, War Built Vessels".

Not until June 16, 1951, did the Maritime Administration, the successor to the Commission, decide just how much the plaintiff should be charged for the slotting and strapping. The charge was $16,600 per ship, and the balance of the deposits of $28,875 per ship, i. e., $12,275 per ship, was refunded to the plaintiff. The plaintiff says that the cause of action accrued only when the decision to keep the $16,600 for each ship was made, and that the instant suits were therefore filed in time.

The plaintiff says that the Commission and the Maritime Administration had not, at the time it demanded and received the money in question from the plaintiff, made up its mind as to whether slotting and strapping was a desirable feature at all, for which it should charge anything. The plaintiff quotes from testimony before a Committee of Congress on March 6, 1950, House Doc. 465, 81st Cong.2d Sess., pp. 24–27, showing that the problem of determining what were desirable features, and requiring purchasers to pay for them, was a hard one. The plaintiff quotes from a report of a committee of the staff of the Maritime Administration, dated June 16, 1951, the day of the Administration's decision as to the amount to be charged for slotting and strapping. This committee recommended the formula which the Administration adopted for computing the charges. The committee noted that a firm of lawyers for a purchaser (not the plaintiff) was contending that slotting and strapping was not a desirable feature at all.

When all the circumstances are taken into account, one gets back to the facts that in 1947 and 1948 the Commission required the plaintiff to pay money to it, and that it is the whole basis of the plaintiff's suit that the Commission had no right to collect this money from the plaintiff. There was no understanding of the parties that any part of the payment was to be returned to the plaintiff except so much as, according to the formula which would be adopted by the Commission for measuring the proper charge for slotting and strapping, would be in excess of the charge and refundable. The plaintiff, having paid the money in order to get the ship which it was entitled to without paying the charge, could have, laying aside the problems of voluntary payment and acquiescence, brought suit immediately to recover the entire payment. If it had done so it would, presumably, have obtained the same judgment as was rendered in Southeastern Oil Florida, supra. It had, in 1947 and 1948, the same basis for suit and the same right to sue which it had in 1955 and 1957 when these suits were filed. The only difference was that, in 1951, a part of the money had been voluntarily repaid to the plaintiff, but not under circumstances indicating an acknowledgment of any claim to an additional amount.

The problem of the deposit of the payments in an "unearned moneys" account has been considered in cases arising in the United States Court of Appeals for the Second Circuit. In Sword Line v. United States, 228 F.2d 344, and American Eastern Corporation v. United States, 231 F.2d 664, certiorari denied 351 U.S. 983, 76 S.Ct. 1050, 100 L.Ed. 1497, the court held that the deposit of the money in the special account did not prevent the statute of limitations from beginning to run at the time of its payment. In Sword Line, Judge Hand dissented on the question of the statute of limitations. In American Foreign Steamship Corporation v. United States, 2 Cir., —— F.2d ——,* a different panel of that Court followed the prior decisions but expressed doubt as to their correctness. The circumstances of the payments in those cases were not so clearly consistent with an immediate right to sue to recover the payments as they are in the instant case.

The plaintiff urges the case of Rosenman v. United States, 323 U.S. 658, 65 S.Ct. 536, 537, 89 L.Ed. 535, upon us as a precedent in its favor. In that suit for the recovery of estate taxes, "alleged to have been erroneously or illegally as-

* Rehearing ordered before Court en banc.

sessed or collected", the applicable statute required that claims for refund had to be filed with the Commissioner of Internal Revenue within three years after the payment of the tax.

In the Rosenman case, the decedent whose estate was taxed died on December 25, 1933. The estate tax became due December 25, 1934. On December 24, 1934, the executors delivered a check for $120,000 to the Collector of Internal Revenue, together with a statement that the money was paid to avoid penalties and interest, and that it was contended that not all of the amount paid was due. Since no determination had been made as to the amount of the estate tax, the collector placed the money in a "suspense account", where money not covered by any outstanding assessment was placed. Pursuant to a granted extension of time, the executors filed their estate tax return in February 1935, showing a tax of $80,-224.24. The collector then transferred that amount from the suspense account into the general funds of the Treasury, and notified the executors to that effect on March 28, 1935. On March 26, 1938, less than three years thereafter, the executors filed a claim for the refund of the difference between the amount of their deposit and the $80,224.24. When the collector finally audited the return, he determined a deficiency which more than used up the balance of the deposit. The executors paid the balance of this deficiency, which was $10,497.34 on April 22, 1938. The collector then denied the claim for refund filed in March of that year. The executors filed another claim for refund on May 20, 1940. The ground for both claims for refund was that the Commissioner of Internal Revenue had refused to allow deductions for administrative expenses, attorneys' fees, etc. This claim was also rejected on the ground, *inter alia*, that the tax had been paid in 1934, more than three years prior to the filing of the claim. As to the $10,497.34 paid in 1938, that ground for rejection was not asserted. The executors sued in this court, which held, 53 F.Supp. 722, 101 Ct.Cl. 437, that the claim for refund had not been filed in time, so far as the money deposited in 1934 was concerned. The Supreme Court reversed, holding that until the Commissioner assessed the deficiency in April 1938, there were no taxes "erroneously or illegally assessed", and no "payment" within the meaning of the statute was made until that time.

In Rosenman, when the deposit of $120,000 was made, the executors were not contending that all or most of it was not to be ultimately kept by the Government. In their own estate tax return, they showed a liability for $80,224.24. As to the balance of the $120,000, the Government had not asked for it nor assessed it. It was in the Government's hands only because the executors had voluntarily placed it there, to avoid interest and penalties on taxes which the executors surmised would be assessed when, in due course, their return was audited. Their purpose in depositing the money was that it should be there, when the assessment occurred, to pay the taxes assessed. They would have had no right to sue for its return, before those events occurred, without at least making a prior demand showing that they had changed their mind and desired to withdraw the part of their deposit which had not been appropriated to pay the taxes shown on their return.

The question in the Rosenman case was not, of course, when a right of action had accrued, but when a "payment" had been made, within the meaning of the statute relating to refunds. The holding that there was no "payment" by merely putting money in the hands of the Government, which had not asked for it and was not claiming it, throws very little light on the instant case in which the payor alleges that the Government had no right to any of the money and the Government insisted on the payment and on the right to keep all of it except what might be refundable as a result of further computation.

The plaintiffs' motions for summary judgment should be denied. The defend-

ant's similar motions should be granted, and the petitions should be dismissed.

It is so ordered.

REED, Justice (Retired), sitting by designation, JONES, Chief Judge, and WHITAKER and LITTLETON, Judges, concur.