**AMERICAN PRESIDENT LINES, Limited, Libelant,**

**v.**

**The UNITED STATES of America, Respondent.**

**No. 1740.**

United States District Court
D. Delaware.

May 2, 1958.

David F. Anderson (of Berl, Potter & Anderson), Wilmington, Del., and Warner W. Gardner and Vern Countryman (of Shea, Greenman, Gardner & McConnaughey), Washington, D. C., for libelant.

Carl C. Davis, Asst. Chief, Admiralty and Shipping Section, Department of Justice, Washington, D. C., Robert D. Klages, Attorney, Admiralty and Shipping Section, Department of Justice, Washington, D. C., of counsel, for the United States.

CALEB M. WRIGHT, Chief Judge.

This is a suit in Admiralty initiated by libelant, American President Lines, against the United States to recover alleged excessive charter payments. Jurisdiction of the libel is predicated on 46 U.S.C.A. § 741 et seq.

The cause is presently before the court on libelant's exceptions to respondent's answer and libelant's prayer for judgment pro confesso. There being no dispute of material fact the libel is in a dispositive posture.[1]

---

1. Longbottom v. American Dredging Company, D.C.E.D.Pa.1958, 159 F.Supp. 296; Infante v. Moore-McCormack Lines, Inc., D.C.E.D.Pa.1950, 93 F.Supp. 239; Dowling v. Isthmian S.S. Corp., 3 Cir., 1950, 184 F.2d 758.

As World War II drew to a close Congress realized that many vessels employed in the War effort would be of little use to the Government in the ensuing post War period. It was also deemed expedient to maintain a properly functioning, privately owned, peacetime Merchant Marine, so that the vessels would be readily available in the event of a national emergency. Consequently, the Merchant Ship Sales Act of 1946 was enacted to dispose of the excess tonnage.[2] The United States Maritime Commission (Commission) was designated the Administrator of the Act.

While the primary purpose of the Act was the demise of the ships to domestic users, Congress also realized charter of the vessels would be preferable in some instances.[3] To accomplish this a chartering provision was inserted in the Act.[4]

Encompassed within the provisions of the Ship Sales Act of 1946 were all vessels constructed or contracted for the account of the United States during the period beginning January 1, 1941 and ending September 2, 1945.[5]

On January 16, 1942, the Maritime Commission and the Bethlehem-Alameda Shipyard, Inc., entered into a contract for the construction of ten troop carriers designated P2–SE2–R1.[6] Eight of the vessels were completed and delivered in 1944 and 1945. Arrangements were made in 1944 to complete the remaining two vessels as commercial combination passenger-cargo vessels, type P2–SE2–R3. Formal amendment of the construction contract reflecting these changes was accomplished on November 7, 1946.[7] As a result of these innovations the two ships styled the President Cleveland and the President Wilson were of a unique class. The chart set forth below summarizes the construction history of the two vessels:[8]

| M. C. Hull No. | Contract Delivery Date | Keel Laid | Launched | Delivered |
|---|---|---|---|---|
| 686 (Cleveland) | 8–1–45 | 8–28–44 | 6–23–46 | 12–15–47 |
| 687 (Wilson) | 9–1–45 | 11–27–44 | 11–24–46 | 4–27–48 |

### Chartering of the Cleveland/Wilson

In order to clarify the factors involved in the instant litigation it is necessary to set out the sequence of events leading to the chartering of the Cleveland/Wilson.

The chartering sections of the Ship Sales Act of 1946 provide in pertinent part, "Any citizen of the United States * * * may make application to the Commission to charter a war-built dry-cargo vessel, under the jurisdiction and control of the Commission, for bare-boat use. * * * * " [9] Pursuant to this provision libelant made formal application to charter in June, 1946.[10] The Commission by letter dated December 12, 1947, advised libelant that a proposed charter

2. 50 U.S.C.A.Appendix, § 1735 et seq.

3. 50 U.S.C.A.Appendix, § 1735(a); Barber Oil Corp. v. Manning, D.C.N.J.1955, 135 F.Supp. 451; 1946 U.S.Code Cong.Service at page 1093.

4. 50 U.S.C.A.Appendix, § 1738.

5. 50 U.S.C.A.Appendix, § 1736(b) (1).

6. Resp.Ex. 8(a) Contract No. MCc—2123.

7. Resp.Ex. 8(f). Addendum No. 5 to Contract No. MCc–2123.

8. Respondent's Reply to Libelant's First and Second Requests for Admission of Facts, page 4.

9. 50 U.S.C.A.Appendix, § 1738(a).

10. Resp.Ex. 1(a) and 1(b): Application dated June 17, 1946, with amendment dated July 29, 1946, by American President Lines, Ltd. to charter certain war-built dry-cargo vessels pursuant to the Merchant Ship Sales Act of 1946.

for the Cleveland/Wilson had been approved. The letter stated in part:[11]

> "The basic charter hire on each vessel to be 8½% per annum on the statutory sales price of each vessel under the 1946 Act as of the date delivered by the Shipbuilder. (Estimated floor price and Sales Price is $7,267,241)."

On the same day, December 12, 1947, the Commission, as required by law, published in the Federal Register the following information:[12]

> "(kk) Type P2–SE2–R3 (Not previously published).
>
> "The P2–SE2–R3 type is a passenger-cargo vessel.
>
> "The prices of the standard type are as follows:

| | Unadjusted |
|---|---|
| Prewar | statutory |
| domestic | sales price |
| cost | (50% 1941 cost) |
| $11,200,000 | [1] $5,600,000 |

> "1 The vessel floor price is estimated to be about $7,267,241 and the minimum sales price will be so determined. The war built cost and floor price will not be finally determined until the vessels have been completed."

Libelant on December 15, 1947, accepted the general terms and conditions outlined in the Commission letter of December 12. By letter dated January 9, 1948, the Commission advised libelant that it had approved the chartering of the Cleveland/Wilson. Since the rate of charter was below the statutory minimum the approval of four board members was necessary.[13] The requisite approval was procured. The letter stated in part:[14]

> "\* \* \* from effective date of delivery thereof (and subject to ultimate adjustment to a rate of 8½% per annum of the finally determined statutory sales price of each vessel), the sum of $51,476.29 payable monthly in advance \* \* \*. The formal Bareboat Charter Agreement and amendments to the Operating-Differential Subsidy Agreement giving effect to the foregoing are being prepared under direction of the General Counsel of the Commission and will be submitted for execution \* \* \*."

The formal charter party MCc–60935 hereafter referred to as "the first charter" was executed by the Commission in October, 1948 and covered the period of time from delivery of the vessels until completion of voyages on or about June 30, 1949. Clause E of this charter provided:[15]

> *"Rate of Basic Charter Hire.* As to each Vessel the Charterer shall pay as basic charter hire from effective date of delivery thereof (and subject to ultimate adjustment to a rate of 8½% per annum of the finally determined statutory sales price or the floor price of such vessels whichever is higher) the sum of $51,476.29 per calendar month (and pro rata for any part of a month) payable monthly in advance."

The sum of $51,476.29 per month specified in both the Commission letter of January 9, 1948 and the first charter (October 5, 1948) represents ½2th of 8½% of the estimated floor price, $7,-267,241, promulgated in the Federal Register on December 12, 1948 and incorporated in the Commission's December 12 letter to libelant.[16]

Delivery of the Cleveland and Wilson to libelants transpired on December 15, 1947 and April 27, 1948, respectively.[17]

---

11. Lib.Brief, p. 6.

12. 46 C.F.R. § 299.56(kk) (1947).

13. 50 U.S.C.A.Appendix, § 1738(b).

14. Lib.Brief, p. 7.

15. Resp.Ex. 3(a).

16. Note 12, supra.

17. Note 8, supra.

At the request of libelant the first charter was supplemented by an addendum, hereafter referred to as "the second charter", calling for a reduction in basic hire from 8½% to 5% and extending the original charter period until the last voyage completed on or about June 30, 1952.[18] The addendum dated February 8 [19] and April 10, 1950 [20] provided in relevant part: [21]

"2. That, with respect to each vessel, during the period of the extension as aforesaid, basic charter hire shall be paid, pursuant to the provisions of Clause 12, at the following rate: 5% per annum of the preliminary sales price of $7,267,-241., (herein referred to as the *minimum* basic hire) which shall be deemed to be an unconditional obligation, *provided*, that additional basic charter hire of 3–½% per annum of such preliminary sales price shall be paid from net voyage profits relating to each calendar year or other accounting period before any participation in such earnings by the Charterer pursuant to the provisions of Clause 13, Part II, and *provided further*, that such basic charter hire shall be subject to ultimate adjustment to the same rate of the finally determined statutory sales price of each of the vessels. If, therefore, at the end of any calendar year, or other accounting period, the total cumulative net voyage profits relating to such calendar year or other accounting period of both vessels before basic hire therefor are in excess of such minimum basic charter hire, the basic hire for the two vessels shall be increased by the amount by which such cumulative net voyage profits before such basic hire exceeds the minimum basic hire, provided that such increase shall not operate

to increase the basic hire to in excess of 8–½% per annum on the basis hereinabove provided.

"3. That, except as herein specifically modified, all the terms and conditions of the Agreement (first charter) shall remain in full force and effect." (Parenthesis supplied.)

Prior to the expiration of the second charter, Section 5 of the 1946 Act was amended by the insertion of subparagraph (f) which stated, "the Secretary of Commerce may charter any passenger vessel, whether or not war-built, owned by the United States on or after June 30, 1950, pursuant to Title VII of the Merchant Marine Act, 1936, as amended." [22] Section 1196 of the 1936 Act requires all charters of Government owned vessels be awarded on competitive bidding.[23] Accordingly, the Maritime Administration on June 6, 1952, issued an invitation for bids which provided in pertinent part: [24]

"No bid for the charter of the vessels, which is conditioned on receiving an operating differential subsidy, will be considered which offers the payment of basic charter hire in an amount less than 8½% of the finally-determined statutory sales price or the floor price of such vessels (whichever is higher) * * *. The estimated floor price of the Vessels is $7,267,241."

Pursuant to the invitation, libelant submitted a bid for charter of the vessels as follows: [25]

"(a) For charter *with* operating-differential subsidy the sum of Fifty One Thousand Four Hundred Seventy Six and 29/100 Dollars ($51,-476.29), subject to ultimate upward adjustment if necessary, to a rate of

18. Resp.Ex. 3(b).

19. Executed on behalf of the charterer, American President Lines.

20. Executed on behalf of the owner, the United States.

21. Resp.Ex. 3(b) clauses 2 and 3.

22. 50 U.S.C.A.Appendix, § 1738(f) (1).

23. 46 U.S.C.A. § 1196.

24. Resp.Ex. 5(a); Lib.Brief, p. 9.

25. Resp.Ex. 6; Lib.Brief, p. 10.

8½ percent per annum of the finally-determined statutory sales price or the floor price of such vessels (whichever is higher)."

Libelant's bid was accepted and on July 2 the parties executed Contract No. MA–483, hereafter referred to as "the Third Charter" which covered a three year period commencing in July, 1952.[26]

In August, 1954 the Third Charter was terminated by mutual agreement whereupon the vessels were redelivered to the Government. Shortly thereafter the ships were demised outright to libelant.[27]

The following chart summarizes succinctly the pertinent matters relevant to the chartering of the Cleveland/Wilson:[28]

| | First Charter* Date | | Second Charter Date | | Third Charter Date | |
|---|---|---|---|---|---|---|
| | Executed (By Commission) | Vessels Delivered | Executed (By Commission) | Executed | | Terminated & Vessels Redelivered |
| Cleveland | 10–5–48 | 12–15–47 | 4–10–50 | 7–2–52 | | 8–4–54 |
| Wilson | 10–5–48 | 4–27–48 | 4–10–50 | 7–2–52 | | 8–27–54 |

*Charter dated Dec. 9, 1947

Charter Payments

Pursuant to the charter arrangements, the libelant in discharge of its contractual obligations made the following payments:[29]

| First Charter | Amount Paid |
|---|---|
| Rate – 8½% x $7,267,241 (Est.Floor) Per annum | $1,529,537.65 |

| Second Charter | |
|---|---|
| Rate – 5% x $7,267,241 (Est. Floor) Per annum | 2,196,289.10 |

| Third Charter | |
|---|---|
| Rate – 8½% x $7,267,241 (Est. Floor) Per annum | 2,451,240.06 |
| Total regular payments on first three Charters | $6,177,066.81 |

26. Resp.Ex. 4(a). In pertinent part the charter provided:
"Clause 5. *Basic Charter Hire.* As to each Vessel the Charterer shall pay as basic charter hire from effective date of delivery thereof (and subject to ultimate upward adjustment if necessary, to a rate of 8½% per annum of the finally determined statutory sales price or the floor price of such Vessels whichever is higher) the sum of $51,476.29 per calendar month * * * payable monthly in advance, * * *."

27. Resp.Ex. 7(e), (f), (g), (h).

28. On August 4, and August 27, 1954, the President Cleveland and President Wilson were demised outright to the libelant. (President Cleveland—Contract of Sale MA–834 dated Aug. 4, 1954; President Wilson—Contract of Sale MA–835 dated Aug. 27, 1954).

29. Lib.Brief, p. 11; Resp.Brief, p. 26.

On September 2, 1952, respondent notified libelant that the finally determined domestic war cost was $22,698,696, thereby necessitating an adjustment in the floor price from the original estimation of $7,267,241 to 35% of $22,698,696 or $7,944,544. Under protest libelant paid the increased basic charter hire as illustrated in the accompanying chart: [30]

### Amount of Additional Hire Paid by Libelant

Amount of additional hire paid by libelant resulting from the difference between the finally determined floor price ($7,944,544) and the estimated floor price ($7,267,241).

**First Charter**

| Rate 8½% | $140,201.66 |
|---|---|

**Second Charter**

| Rate 5% | 204,609.79 |
|---|---|

**Third Charter**

| Rate 8½% | 228,405.39 |
|---|---|
| | $573,216.84 |

Subsequently, on September 1, 1955, American President Lines filed its libel in this proceeding asserting that under the provisions of the Merchant Ship Sales Act [31] and the charters, basic hire for the Cleveland/Wilson must be calculated upon the unadjusted statutory sales price of $5,600,000; consequently the basic charter hire paid under the first two charters on the basis of the "preliminary sales price" or "estimated floor price" of $7,267,241 was excessive by $854,774.34 and the entire amount of the increased basic charter hire paid under all three charters on the basis of the finally determined floor price of $7,944,544 was unauthorized. Libelant therefore seeks to recover:

| Excessive basic charter hire (First and second charters) | $ 854,774.34 |
|---|---|
| Increased basic charter hire | 573,216.84 |
| Total | $1,427,991.18 |

No claim is made for refund of alleged excessive basic charter hire paid under the third charter, since libelant concludes the third charter providing for "upward adjustment only" commenced the running of the limitation period. Two years from the last payment on the third charter having now elapsed the action is time barred. [32]

Respondent contends no recovery can be had for several reasons. First, the libel is patently inadequate on the merits to afford relief. Moreover, as to the payments made under the first two charters the Admiralty Court has no jurisdiction because the claims are time barred. Furthermore, there was no coercion or duress exercised by the Commission in procuring the hire; therefore, all payments were voluntary, hence incapable of recovery. Finally, respondent avers, libelant is estopped to maintain the action under the doctrine enunciated by the Supreme Court in Callanan Road Improvement Co. v. United States. [33] It will not be necessary to discuss all the assertions of respondent for the court concludes respondent's first and second defenses dispositive of the cause.

To more precisely bring into focus the issues involved, the discussion is divided into two segments, namely, the 1947–1952 payments, and payments made after September 2, 1953.

### 1947–1952 Payments

Libelant contends the monies exacted under the first two charters were calculated on an illegal base. The base em-

---

30. Lib.Brief, p. 13; Resp.Brief, p. 26.

31. 50 U.S.C.A.Appendix, § 1735 et seq.

32. Lib.Brief, p. 14 states: Footnote 6 "No claim is made for refund of excessive tentative basic charter hire paid under the Third Charter, which provides only for upward adjustment of tentative basic charter hire."

33. 1953, 345 U.S. 507, 73 S.Ct. 803, 97 L.Ed. 1206.

ployed by the Government was the estimated floor price of $7,267,241. Libelant maintains the base could only be the unadjusted statutory sales price of $5,-600,000 (½ of the pre-war domestic cost) for two reasons:[34]

1. (a) Basic charter must be fixed at a percentage of the unadjusted statutory sales price.

    (b) The floor price is inapplicable to the unadjusted statutory sales price.

2. The floor price is, in any event, less than the unadjusted statutory sales price.

    The primary question applicable to these payments is whether the suit is time barred. If the present action were commenced more than two years after the cause had accrued the court lacks jurisdiction to determine the substantive rights of the litigants.[35]

In order to resolve this issue it must be determined when a cause of action matured.[36] Although libelant proffers alternative bases for recovery the underlying principle is the same, namely, under any circumstance the basic rate of charter hire had to be calculated on the unadjusted statutory sales price. First, libelant submits that by charter agreement and statutory direction the unadjusted satutory sales price was incorporated in the formal document of hire. Alternatively, libelant avers that under respondent's contentions the unadjusted statutory sales price was the applicable base.

The unadjusted statutory sales price is determined by halving the prewar domestic cost.[37] By legislative enactment the prewar domestic cost had to be promulgated 60 days prior to the letting of a charter.[38] This provision of the Act was observed.[39] Therefore, on December 12, 1947, when the prewar domestic cost was published in the Federal Register, by a simple arithmetic operation libelant was able to determine the unadjusted statutory sales price. It was at that time all factors relevant to libelant's theories of recovery were in existence. Thus, after every monthly payment an action could have been commenced to recover the alleged excessive exactions. Furthermore, at any time a declaratory judgment action would lie.[40] Libelant, however, did not commence suit for more than six years after termination of the first charter, and three years after termination of the second charter.

Libelant asserts that a cause of action did not accrue until September 2, 1953, the date of notification of the finally determined floor price. Prior to that time libelant avers its rights were not prejudiced because the monthly payments were only tentative. In support of its proposition libelant cites Rosenman v. United States.[41]

There petitioner sued to recover the difference between the liability noted on taxpayer's return and a deposit advanced in 1934 against the estimated estate tax liability of decedent, which was credited to petitioner in a special suspense account. In 1938 the final audit of the return indicated a taxpayer deficiency which was subsequently satisfied. Thereafter in 1940 suit was initiated to recover the alleged overpayment. The Supreme Court held that the cause of action matured at the date of final audit in 1938 not at the time of the preliminary remittance; hence, the action had been commenced within the three year statutory period. The court analogized the deposit to the posting of a surety bond:[42]

    "There was merely an interim arrangement to cover whatever contingencies the future might define. The tax obligation did not become

---

34. Lib.Brief, p. (i) Outline of argument.

35. 46 U.S.C.A. § 745.

36. Sword Line, Inc., v. U. S., 2 Cir., 1955, 228 F.2d 344.

37. 50 U.S.C.A.Appendix, § 1736(d).

38. 50 U.S.C.A.Appendix, § 1736(c); 50 U.S.C.A.Appendix, § 1738(a).

39. Note 12, supra.

40. American President Lines v. Mackey, D.C.D.C.1953, 120 F.Supp. 897.

41. 1945, 323 U.S. 658, 65 S.Ct. 536, 89 L.Ed. 535.

42. 1945, 323 U.S. 658, 662, 65 S.Ct. 536, 538, 89 L.Ed. 535.

defined until April 1938. And this is the practical construction which the Government has placed upon such arrangements. The Government does not consider such advances of estimated taxes as tax payments. They are, as it were, payments in escrow. They are set aside, as we have noted, in special suspense accounts established for depositing money received when no assessment is then outstanding against the taxpayer. The receipt by the Government of moneys under such an arrangement carries no more significance than would the giving of a surety bond. Money in these accounts is held not as taxes duly collected are held but as a deposit made in the nature of a cash bond for the payment of taxes thereafter found to be due. * * * "

The instant action discloses no intent that the payments of basic hire were to be treated as deposits in the nature of a bond for payment of charter hire thereafter found to be due. Merely because the first and second charters might have permitted a refund if the finally determined floor did not exceed the estimated floor, they should not be construed as calling for deposits instead of payments. The nature of the actions is strikingly dissimilar. In Rosenman the money was transmitted under protest, prior to the filing of a return.[43] In addition, when the return was filed the Government specifically credited the executor's account for the difference. At that time the Government asserted no claim to the money. It was only at the date of audit that the Government demanded absolute ownership of the deposit.[44]

In the present action, payments were made from the beginning on a base that libelant terms illegal. Furthermore, the funds were not required to be placed in a special account.[45] These facts were in existence at the occasion of each and every remittance.

In order for libelant to have asserted a timely cause under its theories, pertinent to the first and second charters, it would be necessary to construe the intent of the parties at the time of letting the charters as treating the payments tentative pending a subsequent interpretation of the relevant statutory and charter provisions. The circumstances do not warrant this strained analysis. Clearly what the parties purposed was a factual inaccuracy between the estimated floor price and the finally determined floor price which had to await compilation of certain cost data. It was the inability to properly ascertain the cost components of the Cleveland/Wilson in 1947 that prompted the promulgation in the Federal Register and the insertion in the charters of an estimated floor price.

Thus evaluated, the court holds with respect to the first two charters, the

43. Rosenman v. United States, 323 U.S. 658, 659–660, 65 S.Ct. 536, 89 L.Ed. 535.

44. For a trenchant analysis of Rosenman v. United States, see Jackson v. United States, Ct.Cl.1958, 158 F.Supp. 357.

45. The court by letter dated December 23, 1957, requested from libelant and respondent the following information:
Libelant:
"Q4. Were the payments exacted pursuant to the charters required to be placed in a special suspense account?"
Proctor for libelant responded by letter dated January 13, 1958:
"(4) There was no requirement in the charters or by any other arrangement between Libelant and Respondent that the payments, made pending determination of the floor price, be placed in a special suspense account. * * * "
Respondent:
"Q6. Describe how the Treasury Department accounted for the hire received re the present charters."
Proctor for respondent by letter dated February 13, 1958, replied:
"(6) The Treasury Department upon receipt of basic charter hire deposited the same in its miscellaneous receipts. This is required by Section 12(d) of the Act, which states:
"'All moneys received by the Commission under this Act shall be deposited in the Treasury to the credit of miscellaneous receipts.'"

cause of action matured more than two years prior to the commencement of the immediate suit.

In addition to the foregoing, the libel is patently inadequate to afford relief. Libelant essentially contends:

1. Each of the three charters of the vessels was intended with variations in the language between them to adopt the statutory sales price of the Merchant Ship Sales Act of 1946 as the base from which to compute charter hire.[46]

2. The text of Section 5 of the Act of 1946 does not categorically state but does strongly imply that hire for vessels chartered under its authority shall be computed from the statutory base alone with discretionary authority to vary the rate but not the base.[47]

3. The legislative history and the administration practice are crystal clear that charter rates could be varied, but not the basic price upon which the rates are based.[48]

4. Section 3 of the Act of 1946 fixed the statutory sales price (and the charter base) for the vessels at 50% of the prewar domestic cost of the vessels. It continued in sub-section (d) to provide for four adjustments to that price, of which depreciation is the most important. In the same subsection it provided that "no adjustment * * * shall be made * * * which will result in a statutory sales price * * * less than 35 per centum of the domestic war cost." This floor price was plainly enacted only as a limit to adjustments not as an alternative to the statutory sales price. As no adjustments were made to the statutory sales price of the Cleveland/Wilson the so-called floor price had no office to perform. It could not, therefore, consistent with the statute be used as an alterna-

tive and superseding price because higher than the statutory sales price.[49]

5. Even if the "floor price" be applied to supersede the statutory sales price, and not merely to limit the adjustments thereto, the Government cannot prevail. That "floor price" is 35 per centum of the "domestic war cost", defined as the average cost of similar vessels delivered in 1944, or, if principal deliveries were made later, in the six-month period "most representative of war production costs." The Cleveland/Wilson, the only two vessels of their type, were delivered in 1947 and 1948, long after the war production program had been closed. They have, then, no "war production cost." Under the Administration's regulations, "in the case of any vessel for which there is no domestic war cost," the floor price is to be fixed in the same ratio to prewar domestic cost as for the most nearly comparable type of vessel. Under any selection of a comparable type vessel, the "floor price" of the Cleveland/Wilson is less than the statutory sales price and libelant must prevail.[50]

■ Libelant initially stresses that the intent of the parties was to incorporate in the charters the definitions and statutory language found in Section 3 of the Act.[51] Whatever may be the command of that section the court deems irrelevant.[52] Any intent evidencing the desire to incorporate the sales sections was merely of a general nature. Pervading throughout the negotiations was the specific intent to procure a stipulated rate of hire, i. e., the statutory sales price or floor price whichever was higher. This is abundantly clear from the documents executed by the parties.

· Clause E of the first charter specifically sets forth: [53]

46. Lib.Brief, p. 15.

47. Lib.Brief, p. 15.

48. Lib.Brief, p. 15.

49. Lib.Brief, p. 16.

50. Lib.Brief, p. 17.

51. 50 U.S.C.A.Appendix, § 1736.

52. Even under libelant's view that 50 U.S.C.A.Appendix, § 1736, is applicable, a recent Court of Claims decision apparently negates libelant's construction of the pertinent provisions urged upon the court. See Alaska Steamship Company v. United States, Ct.Cl.1958, 158 F.Supp. 361.

53. Note 15, supra.

"As to each Vessel the Charterer shall pay as basic charter hire from the effective date of delivery thereof (and subject to ultimate adjustment to a rate of 8½% per annum of the finally determined statutory sales price or floor price of such Vessels whichever is higher) the sum of $51,476.29 per calendar month * * * payable monthly in advance."

Similarly the third charter states:[54]

"As to each Vessel the Charterer shall pay as basic charter hire from effective date of delivery thereof (and subject to ultimate upward adjustment if necessary, to a rate of 8½% per annum of the finally determined statutory sales price or the floor price of such Vessels whichever is higher) the sum of $51,476.29 per calendar month * * * payable monthly in advance, * * *."

The second charter was an addendum to the first and although it did not spell out the terms of hire as precisely and cogently as the first and third charters the language employed leaves no doubt as to its purport. Clauses 2 and 3 of this second charter provide in relevant part:[55]

"2. That, with respect to each vessel, during the period of the extension as aforesaid, basic charter hire shall be paid, pursuant to the provisions of Clause 12, at the following rate: 5% per annum of the preliminary sales price of $7,267,-241, (herein referred to as *minimum* basic hire) which shall be deemed to be an unconditional obligation, * * * *provided further*, that such basic charter hire shall be subject to ultimate adjustment to the same rate of the finally determined statutory sales price of each of the vessels. * * *

"3. That, except as herein specifically modified, all the terms and conditions of the Agreement (first charter) shall remain in full force and effect." (Parenthesis supplied.)

In each charter the rate of initial hire was calculated on the identical base, $7,267,241, denominated the estimated floor price or the preliminary sales price. The court, therefore, concludes that the specific intent of the three charters encompassing payments made from 1947–1952 was to exact hire based on the estimated floor price, subject to ultimate adjustment to a specific rate of hire based on the finally determined statutory sales price or floor price whichever was higher.[56] In the first and third charters the preliminary payments (subject to final adjustment) were to be 8½% of $7,267,-241 or $51,476.29 per month. The second charter while not using that precise language specifically sets forth the base in dollar amount. Thus, whether there was a general intent to incorporate the provisions of other sections of the Act is immaterial, for as observed in Esso Nederland N. V. v. United States,[57] where in the same instrument there exists both a specific and general intent, the specific, must prevail. Although the facts in Esso are inapposite to the matters before this court the rule enunciated is peculiarly appropriate. In construing certain provisions of the sales sections of the Act of 1946 the Court of Claims stated:[58]

"There is no foundation for the plaintiffs' argument for incorporation by reference except the general intent of both parties that foreigners were to be treated the same as citizens in these sales of ships. When the Government learned, from our Bull decision in 1952 [A. H. Bull Steamship Co. v. United States,

54. Note 26, supra.

55. Note 21, supra.

56. The third charter provides for "upward adjustment only."

57. Ct.Cl.1957, 151 F.Supp. 285, 287.

58. 1957, 151 F.Supp. 285, 287.

123 Ct.Cl. 520], how we thought citizens had to be treated under the statute, it decided that it would treat foreigners as it had all along thought that both citizens and foreigners should be treated.

"We think that the general intention described above is not sufficient to override the specific intention which the parties both entertained, and which they wrote expressly into their contracts, that charges for desirable features were to be paid in addition to the already known floor prices of the ships. * * *"

Unless statutory fiat compels incorporation of the Sales Act sections as libelant construes those provisions, the hire exacted cannot be deemed the subject matter of a refund action.

■ Libelant's second argument is directed basically to statutory prescription. As has been previously set forth the court is urged to construe the provisions of section 5[59] as permitting only variations in the percentage of hire exacted. So viewed the Commission would lack the requisite discretion to alter the base.

A perusal of the applicable statutory sections discloses no such intent. Section 5(b) of the Act merely delineates the bounds beyond which the Commission has no discretion. Specifically, the section enunciates three limitations. They are:[60]

1. The charter hire for any vessel chartered under the provisions of this section shall be fixed by the Commission at such rate as the Commission determines to be consistent with the policies of the Act;

2. Except upon the affirmative vote of not less than four members of the Commission, such rate shall not be less than 15 per centum per annum of the statutory sales price (computed as of the date of charter); and

3. Except in the case of vessels having passenger accommodations for not less than eighty passengers, rates of charter hire fixed by the Commission on any war-built vessel which differ from the rate specified in this sub-section shall not be less than the prevailing world market charter rates for similar vessels for similar use as determined by the Commission.

Since both the Cleveland and Wilson have capacities for more than eighty passengers, the third clause is of no moment to the present controversy. Hence only the first and second restrictive clauses are applicable.

The court has been apprised of no circumstance which would necessitate a determination that the hire exacted did not conform with the declared purport of the Act. The amounts charged were clearly within sound economic limits and in no manner could they be termed unconscionable. In all instances of charter hire the Commission had to refrain from contracting for hire which would be far less than the market could bear. For if the hire were made too attractive the pronounced policy to demise vessels outright would be thwarted.[61] No prudent business man would purchase a commodity which could be leased at a comparatively more favorable price.

Manifestly, libelant's contention is premised on the interpretation of clause 2 of § 5(b).[62] The gist of this restric-

59. 50 U.S.C.A.Appendix, § 1738.

60. 50 U.S.C.A.Appendix, § 1738(b).

61. The U. S. Code Congressional Service (1946) at p. 1093 states:
   "Charters To Citizens
   "While it is the policy of the bill (Merchant Ship Sales Act of 1946), to place as many of the war-built vessels as possible in the hands of private operators, it is recognized that there will be many cases where, because of uncertainty of success in re-establishing a trade, or because of opening up a new trade, sales will not be possible, whereas charters will. If the operator meets with success under a charter, he will in all likelihood desire to purchase the chartered vessel or another war-built vessel. * * *" (Parenthesis supplied.)

62. 50 U.S.C.A.Appendix, § 1738(b).

tion is to limit the Commission's discretion so that without the concurrence of at least four members of the board, charter hire cannot be less than 15% of the statutory sales price. For example, if the statutory sales price of a vessel be $1,000,000 the minimum charter hire that can be exacted without four member acquiescence is $150,000.

■■ To interpret this clause in any other manner would, indeed, distort the plain meaning of the language employed. Especially would this be true if the court held that the second clause of § 5 (b) enunciates a ceiling above which hire cannot be exacted. In fact, libelant's position is bottomed not on the wording of the statute but on what it terms was the intent of Congress. Whatever Congress intended in enacting this portion of the statute is immaterial, for reference to the lawmaker's purpose is only relevant where the provision is ambiguous.[63] To construct an ambiguity by resorting to the minutes of committee hearings where the statutory language is unequivocal is certainly not a proper interpretative device. The court, therefor, holds the rate of hire provided for by the charters did not violate any portion of § 5(b) of the Merchant Ship Sales Act of 1946. Hence there is no necessity to rule on libelant's proffered construction of the sales provision of the Act.[64]

■ There remains to be considered libelant's alternative contention—"the floor price is in any event less than the statutory sales price." This argument is addressed to the method of computation employed by the Commission in calculating the estimated floor price.

The principal question here presented is the proper construction of § 3(e) of the Sales Act which provides:[65]

"(e) 'Domestic war cost' as applied to any type of vessel means the average construction cost (without

national defense features) as determined by the Commission, of vessels of such type delivered during the calendar year 1944, except in case of any type of vessel the principal deliveries of which were made after the calendar year 1944, there shall be used in lieu of such year 1944 such period of not less than six consecutive calendar months as the Commission shall find to be most representative of war production costs of such type."

Libelant submits that the period of delivery of the Cleveland/Wilson was not during a period representative of war production costs; war production having ceased in 1945, with the surrender of Japan; whereas delivery of these vessels did not occur until 1947 and 1948. Therefore, urges libelant, the vessels have no domestic war cost; hence Commission regulation 299.1e is applicable which states:[66]

"In the case of any vessel for which there is no domestic war cost as defined in this paragraph, such domestic war cost shall be in the same ratio to the prewar domestic cost * * * as the domestic war cost of the most nearly comparable type of vessel for which a domestic war cost is available is to the prewar domestic cost of such similar vessel."

Libelant indicates that the application of this formula will result in a domestic war cost of $15,568,000 and a resulting floor of $5,438,800. This floor would be less than the unadjusted statutory sales price of $5,600,000. Therefore, libelant contends under the charter parties as interpreted by respondent—the unadjusted statutory sales price or floor whichever is higher—$5,600,000 is the applicable base.

The court deems libelant's position rather tenuous. First, the court has

63. Gemsco, Inc., v. Walling, 1944, 324 U.S. 244, 260, 65 S.Ct. 605, 89 L.Ed. 921; Welsh v. W. J. Dillner Transfer Co., D.C.W.D.Pa.1950, 91 F.Supp. 685.

64. Note 52, supra.

65. 50 U.S.C.A.Appendix, § 1736(e).

66. 46 C.F.R. § 299.1(e) 1946.

been directed to no statutory language that necessitates concluding a vessel must be delivered during a period of war production in order to have a domestic war cost. It is unlikely that Congress intended to so provide, for if a ship were 90% complete during a period of war production but actual delivery occurring in a subsequent period, according to libelant's view, this ship could have no domestic war cost.[67] Further, the court is not prepared to conclude that the day Japan surrendered terminated war production efforts. A perusal of the history of these vessels indicates that contracts were executed in 1942; the keels were laid in 1944; the ships were launched in 1946; and delivery occurred 1947–1948.[68] Under these circumstances the court holds the respective vessels were constructed during a period representative of war production costs. The respondent therefore correctly applied the definition enunciated in § 3(e) when it based the floor price estimation on the actual construction costs, since the vessels were of unique construction.[69]

In summary, recovery is denied libelant on 1947–1952 payments made pursuant to the first and second charters for two reasons:[70]

1. The action is time barred.

2. Hypothesizing timely initiation of the libel, libelant's cause is deficient on the merits.

### Payments made Subsequent to September 2, 1953

Since the present action was commenced within two years after notification of the finally determined floor price the court has jurisdiction over payments made subsequent to September 2, 1953.[71] As previously observed, the amount of hire involved herein is composed of the following:[72]

| | |
|---|---|
| First Charter | $140,201.66 |
| Second Charter | 204,609.79 |
| Third Charter | 228,405.39 |
| | $573,216.84 |

Libelant's contentions pertinent to these payments are identical with those previously stated. Similarly the court's determinations applicable to the hire exacted pursuant to the 1947–1952 payments dispose of these matters exclud-

---

**67.** The court by letter dated December 23, 1957, posed the following interrogatory:

"Q 2. How would libelant calculate the domestic war cost of the following *unique* vessels delivered after cessation of hostilities:

"a. A vessel which was 90% complete during a period of war production as libelant employs the term, the remaining 10% incurred subsequently.

"b. A vessel which was 50% complete during a period of war production as libelant employs the term.

"c. A vessel only 10% complete during the crucial period.

"(The above question is addressed to libelant's second argument namely, 'The Floor Price Is, In Any Event, Less Than The Unadjusted Statutory Sales Price.')" Libelant by letter dated January 13, 1958, replied as follows:

"(2) We would calculate the domestic war cost of each of the three hypothetical vessels pursuant to Section 299.1(e) (1) of the Administration's regulations. Since none of the three vessels was *delivered* during a period 'representative of war production costs of such type,' Sec-

tion 3(e) of the Act provides no formula for computing domestic war cost regardless of the percentage of completion during the period of war production. The fact that the vessels are unique does not preclude the application of Section 299.1 (e) (1) of the regulations, which directs the use of ratios not of the same type of vessel for which a domestic war cost is available [in which event Section 299.1(e) (1) would never apply], but of ratios of 'the *most nearly comparable type* of vessel for which a domestic war cost is available.'"

**68.** Note 8, supra.

**69.** 50 U.S.C.A.Appendix, § 1736(e).

**70.** For disposition of payments made pursuant to third charter during period under discussion, see note 32, supra.

**71.** On September 2, 1953, respondent notified libelant the finally determined domestic war cost was $22,698,696, thereby necessitating an adjustment in the floor price from $7,267,241 to $7,944,544. The present libel was filed September 1, 1955.

**72.** Note 30, supra.

ing, of course, all discussion of the time bar issue which is concededly inapplicable to the instant payments. In the interest of clarity the court's original conclusions will be briefly restated.

### First Charter

Under the provisions of the first charter, hire was to be calculated at 8½% per annum of the "finally determined statutory sales price or floor price of such vessel whichever is higher." The statutory sections applicable to chartering vessels confer on the Commission wide latitude in exacting hire payments. Contrary to the contentions of libelant the provisions of the first charter fall clearly within the defined limits enunciated in the statute. So viewed the court deems the payments made pursuant to the finally determined floor price proper.

### Second Charter

Although the language employed in the addendum to the first charter was not as explicit as that used in the initial instrument it is abundantly clear that the parties intended to adopt in the addendum the aforementioned operative provisions inserted in the first charter. Clause 3 of the second charter provides:[73] "That, except as herein specifically modified, all the terms and conditions of the Agreement (first charter) shall remain in full force and effect." (Parenthesis supplied.) The court has been apprised of no circumstance which would indicate the parties intended to vary the previously conceived base articulately set forth in the initial charter party. This lack of purpose to alter the base is manifestly demonstrated by the use of the estimated floor price in dollar form as the preliminary sales price. Clause 3 would therefore necessitate construing the language of the second charter as mirroring the parallel provisions found in the first charter, namely, the statutory sales price or floor price whichever is higher. Since as observed, the finally determined floor price was properly calculated the supplemental pay-

ments made pursuant to the second charter were duly exacted.

### Third Charter

The third charter in pertinent part provides,[74] " * * * (subject to ultimate upward adjustment if necessary, to a rate of 8½% per annum of the finally determined statutory sales price or the floor price of such Vessels whichever is higher) * * *." This language is substantially identical with the provisions of the first charter. Consequently, for the reasons pronounced under the court's discussion applicable to the first charter, the supplemental exactions are sustained.

This opinion, therefore, need not reach a determination on respondent's additional assertion that the 1950 amendment to the charter sections of the Ship Sales Act specifically refutes any contention advanced by libelant applicable to the third charter.

Counsel to submit order in conformity with this opinion.

---

73. Note 21, supra.

74. Note 26, supra.