291 F.2d 598
 AMERICAN-FOREIGN STEAMSHIP CORPORATION, Libelant-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
STOCKARD STEAMSHIP CORPORATION, Libelant-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
A. H. BULL STEAMSHIP CO., Bull-Insular Line, Inc., Baltimore Insular Line, Inc., Libelants-Appellants,
v.
UNITED STATES of America, Respondent-Appellee.
NEW YORK AND CUBA MAIL STEAMSHIP COMPANY, Libelant-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
DICHMANN, WRIGHT & PUGH, INC., Libelant-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
POLARUS STEAMSHIP CO., Inc., Libelant-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
A. L. BURBANK & COMPANY, Ltd., Libelant-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
T. J. STEVENSON & CO., Inc., Libelant-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
NORTH ATLANTIC AND GULF STEAMSHIP CO., Libelant-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
LUCKENBACH STEAMSHIP COMPANY, Inc., Libelant-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
BLIDBERG ROTHCHILD CO., Inc., Libelant-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
FALL RIVER NAVIGATION CO., Libelant-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
 Nos. 202-215.
 Docket 24190.
 Docket 24200.
 Docket 24291.
 Docket 24292.
 Dockets 24283-24289.
 Dockets 24400-24402.
 United States Court of Appeals Second Circuit.
 Argued December 8, 1960.
 Decided May 26, 1961.
 
 J. Franklin Fort, Kominers & Fort, Washington, D. C. (John Cunningham, and Israel Convisser, Washington, D. C., of counsel), for all libelants-appellants except American-Foreign S. S. Corp.
 Burlingham, Hupper & Kennedy, New York City, of counsel, for North Atlantic & Gulf Steamship Co. and Luckenbach Steamship Co.
 Cravath, Swaine & Moore, New York City, of counsel, for New York & Cuba Mail S. S. Co.
 Hill, Betts & Nash, New York City, of counsel, for Dichmann, Wright & Pugh, Inc.
 Kirlin, Campbell & Keating, New York City, of counsel, for A. H. Bull S. S. Co., etc.
 Lester Levin, New York City, of counsel, for Polarus S. S. Co., Inc., A. L. Burbank & Co., Ltd., and T. J. Stevenson & Co., Inc.
 Zock, Petrie, Sheneman & Reid, New York City, of counsel, for Stockard S. S. Corp., Blidberg Rothchild Co., Inc., and Fall River Nav. Co. (Roberts & McInnis, Washington, D. C., Francis J. O'Brien, New York City, Charles B. McInnis, and Roger H. Muzzall, Washington, D. C., of counsel), for Fall River Nav. Co.
 Arthur M. Becker, Washington, D. C., Foley, James & Conran, New York City (Becker & Maguire and Gerald B. Greenwald, Washington, D. C. of counsel), for libelant-appellant American-Foreign S. S. Corp.
 Leavenworth Colby, Chief, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., and S. Hazard Gillespie, Jr., U. S. Attorney, S.D.N.Y., New York City, on the briefs), for the United States.
 Before CLARK, WATERMAN, MOORE, FRIENDLY and SMITH, Circuit Judges.
 J. JOSEPH SMITH, Circuit Judge.
 
 
 1
 The instant case presents fourteen consolidated appeals. The appellants are in all cases shipping concerns whose actions against the United States under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., have been dismissed in the District Court for the Southern District of New York as time-barred.[1] On appeal to this court, a panel composed of Circuit Judges Hincks and Medina and Retired District Judge Leibell affirmed the dismissal of the libels, American-Foreign Steamship Corp. et al. v. United States, 2 Cir., 1957, 265 F.2d 136, on the authority of Sword Line, Inc. v. United States, 2 Cir., 1955, 228 F.2d 344, affirmed on rehearing, 2 Cir., 230 F.2d 75, affirmed as to admiralty jurisdiction, 1956, 351 U.S. 976, 76 S.Ct. 1047, 100 L.Ed. 1493, and American Eastern Corp. v. United States, D.C.S.D. N.Y.1955, 133 F.Supp. 11, affirmed 2 Cir., 231 F.2d 664, certiorari denied 351 U.S. 983, 76 S.Ct. 1050, 100 L.Ed. 1497.
 
 
 2
 That panel, however, indicated that, were it not for the aforementioned two recent decisions by other panels of this court, it might well pass differently on the limitations question. Petition for reargument in banc was granted and the case was heard again by the then active Circuit Judges, Chief Judge Clark, and Judges Medina, Hincks, Moore and Waterman.[2] A majority of that court rejected the Sword Line and American Eastern cases and held that the libels had been improperly dismissed. The causes were ordered remanded for further factual inquiry to determine whether the parties had agreed, in Clause 13 of the bareboat charters, to postpone suits on all questions until after final audit of the charters — thus suspending operation of the time-bar. Judges Waterman and Clark dissented, being of the opinion that Clause 13 clearly did not postpone the running of the limitations period and that Sword Line and American Eastern were correctly decided; Judge Clark, in his dissent, further questioned, under the wording of 28 U.S.C. § 46(c), the right of Judge Medina (who had retired from regular active service under the provisions of 28 U.S.C. § 371 (b) between the time of the submission of the appeals to the court in banc and the date of the decision in the case) to cast a vote on the in banc court.
 
 
 3
 After the denial of a petition for rehearing, the Supreme Court granted certiorari only on the question of Judge Medina's interim retirement, 1959, 361 U.S. 861, 80 S.Ct. 117, 4 L.Ed.2d 101. That Court held, per Justice Stewart, that he had not been eligible; it vacated the in banc decision and remanded to this court for further proceedings, intimating "no view as to the merits of the underlying litigation." 1960, 363 U.S. 685, 80 S.Ct. 1336, 1340, 4 L.Ed.2d 1491.
 
 
 4
 Although the factual background of these disputes has been recorded in the course of former voyages through this court, it will be helpful to attempt once again to place these facts in proper perspective. During the Second World War the United States Government, not surprisingly, had a virtual monopoly on the ownership of all floating vessels. It used the facilities of the existing civilian maritime industry with those ship operators acting generally as managerial agents for the United States. After the termination of hostilities the government moved to get out of the general maritime industry in favor of the civilian commercial operators. Starting in early 1946 the War Shipping Administration began chartering many war-built vessels under a form of bareboat charter agreement known as "Warshipdemiseout Form 203." By the Act of Congress of July 8, 1946, Section 202, 60 Stat. 481, at page 501, the War Shipping Administration was abolished effective September 1, 1946 and its functions transferred to the Maritime Commission (Maritime). In August, Maritime announced its intention to cancel all Warshipdemiseout 203 charters as of August 31, 1946 — and to substitute a new form of charter, "Shipsalesdemise 303," which was chiefly distinguished from its predecessor by a sliding scale for the payment of "additional charter hire" geared to the profits of the charterers. Whereas the earlier charter had provided for a flat 50% government charge on profits in excess of a 10% return on capital, "303" provided for the payment to Maritime of up to 90% of the excess profits
 
 
 5
 Appellants, singly and through their trade association, protested the imposition of this sliding scale for "additional charter hire," alleging that Maritime's action was illegal and outside the scope of its statutory authority under section 5(a) and (b) of the Merchant Ship Sales Act of 1946, 50 U.S.C.A.Appendix § 1738 and § 709(a) of the Merchant Marine Act of 1936, 46 U.S.C.A. § 1199(a). Nevertheless, they all signed the new charters calling, in Clause 13, for the sliding scale on profits in excess of 10% of capital necessarily employed. The disputed Clause 13, after making provision for the graduated rates, stated:
 
 
 6
 "The Charterer agrees to make preliminary payments to the Owner on account of such additional charter hire and on account of any additional charter hire accrued under any War Shipping Administration Form 203 (Warshipdemiseout) charter (prior to the times of payment provided for above or in such Warshipdemiseout charters) at such times and in such manner and amounts as may be required by the Owner; provided, however, that such payment of additional charter hire shall be deemed to be preliminary and subject to adjustment either at the time of the rendition of preliminary statements or upon the completion of each final audit by the Owner, at which times such payments will be made to the Owner as such preliminary statements or final audit may show to be due, or such overpayments refunded to the Charterer as may be required."
 
 
 7
 Although by far the largest claims of these applicants concern the repayment of allegedly illegal additional charter hire,[3] there are many other claims pressed, some of them quite substantial. One is based on the alleged unauthorized insistence by Maritime that 1947 be split into two separate accounting years because of the insertion of a "foreign trade addendum" into the charters.[4] There are disputes on the interpretation of the charters concerning the availability of certain cumulative accounting methods involving the disallowance by Maritime of "loss carry-backs."[5] Finally, there are diverse claims involving the disallowance of specific expenditures involved in the computation of the basic and additional charter hire paid Maritime. These include disagreements over "capital necessarily employed,"[6] the disallowance of certain alleged post-redelivery overhead expenses,[7] management fees,[8] and agency fees.[9] Blidberg alone asserts a claim against the government for recovery of expenses incurred because of claimed latent defects present in certain vessels at the time the government handed them over to the charterer.
 
 
 8
 Because of the consolidation of so many causes in this appeal, the relevant time factors are somewhat incomplete on the record. It is agreed, however, that in all cases the libels were instituted more than two years after the redelivery dates of the last vessel, i. e. the time of termination of active operation under the charters. Similarly, it is undisputed that all actions were begun within two years of "final audit." Some of the charterers had made substantial payments on additional charter hire within two years of instituting their libels; others had not.
 
 
 9
 The claims advanced by appellants fall into two broad categories. The first embraces those disputes involving the claimed illegality of Maritime's actions. This includes both the additional charter hire rates geared to the amount of the charterers' profits, and the foreign trade addendum — with the resultant split 1947 accounting forced upon appellants in that addendum. In the second category of claims, appellants do not challenge the power of Maritime to insist upon certain contractual terms. These disputes involve the construction and interpretation of the charters as regards proper deductions and expenditures and methods of cumulative accounting. Because of the basic difference between these two types of controversy, different application of the time-bar is justifiable and warranted.
 
 
 10
 The limitations section of the Suits in Admiralty Act, 46 U.S.C.A. § 745, is significant for a number of reasons. The fact that the limitation on actions is "built-in" to the statute makes the timebar a sharp jurisdictional limitation on suits not timely brought under the Act. Osbourne v. United States, 2 Cir., 1947, 164 F.2d 767; Desmond v. United States, D.C.S.D.N.Y.1952, 105 F.Supp. 9, reversed in part on other grounds, 2 Cir., 1954, 217 F.2d 948, certiorari denied 349 U.S. 911, 75 S.Ct. 600, 99 L.Ed. 1246; Burch v. United States, D.C.E.D.Va. 1958, 163 F.Supp. 476; see also Soriano v. United States, 1957, 352 U.S. 270, 77 S.Ct. 269, 1 L.Ed.2d 306. It also evinces a clear Congressional policy frowning upon stale claims against the government. In the case of contract claims against the United States, Congress has decreed that, in admiralty actions, even mildly stale claims are not to be brought. This is apparent when the two year timebar period of section 745 is compared with the six year limitation period applying generally to suits against the United States, 28 U.S.C. § 2401, or with general state limitation statutes applying to contract actions which invariably allow a much longer period to bring suit. See Gen.Stats.Conn. (1958 Rev.) § 52-576; N.Y.Civ.Prac.Act, § 48; Vernon's Ann. Texas Civ.Stats., Art. 5527, 5529; Cal. Code Civ.Proc., § 337; Ill.Rev.Stats., Chap. 83, § 17. The time limitation imposed by the statute must be strictly construed to effectuate the Congressional policy so announced. McMahon v. United States, 1951, 342 U.S. 25, 72 S.Ct. 17, 96 L.Ed. 26.
 
 
 11
 Section 745 states, "Suits * * may be brought only within two years after the cause of action arises." As to the category of disputes centering on the "illegality" of Maritime's actions — the sliding scale for additional charter hire and the split-1947 accounting — the causes of action "arose" at the time the charterers reluctantly signed the questioned agreements. Appellants had protested the inclusion in the charters of both those clauses. Since it was immediately apparent that deposit of large sums would be required under those provisions, the controversies were ripe for action. Charterers could have brought suit in the District Court for a declaratory judgment to determine the legality of the disputed clauses within two years of signing the agreements. See the dictum of the Third Circuit in a very similar case, American President Lines v. United States, D.C.D.Del.1958, 162 F. Supp. 732, 739, affirmed 3 Cir., 1959, 265 F.2d 552. Although declaratory judgment procedure is apparently not often used in admiralty, it has been recognized that it is available. Leonard v. Liberty Mutual Insurance Co., D.C.E.D.Pa.1958, 165 F.Supp. 154, reversed on other grounds 3 Cir., 1959, 267 F.2d 421; Longview Tugboat Co. v. Jameson, 9 Cir., 1955, 218 F.2d 547; Sun Oil Co. v. Transcontinental Gas Pipe Line Corp., D.C. E.D.Pa.1952, 108 F.Supp. 280, affirmed 3 Cir., 1953, 203 F.2d 957.
 
 
 12
 The Suits in Admiralty Act does not specifically sanction declaratory relief against the United States. However, nowhere in that statute is there any indication that the significant reforms later introduced by the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, should not be applicable to admiralty courts and to libels in admiralty against the government. Furthermore, the wording of the Declaratory Judgment Act makes it broadly applicable to "any court of the United States" which would include, presumably, the admiralty courts. Declaratory relief was also available to appellants under the terms of the Administrative Procedure Act, 5 U.S.C.A. §§ 1001-1009. Maritime is surely an "agency" within the scope of section 1001(a) — and section 1009(a), (b) and (c) would appear to have given appellants the opportunity to challenge the legality of Maritime's actions.
 
 
 13
 It may be rather harsh to hold that the charterers are now completely foreclosed for failure to attempt one of those aforementioned courses — which may have been anything but clear at that time. Nevertheless, even if it cannot be said that appellants had a "cause of action" immediately after signing the agreements, a cause of action did arise immediately upon the payment of additional charter hire in excess of 50% of profits — or when preliminary payments were made on the 1947 split-year accounting system. Although the exact dollar amount in issue was open to modification by the effect of profits or losses in later accounting years — or by other supervening disputes over allowable expenses and the like — there nonetheless was a claim, sufficiently liquidated to support a suit, after each overpayment. The charterers had still another path clearly open to them which would have protected their rights; they could have refused to pay charter hire in excess of 50% — and forced the United States to sue them for the difference. See United States v. East Harbor Trading Corporation, D.C.S.D. N.Y.1960, 190 F.Supp. 245.
 
 
 14
 Since the built-in time-bar of the Suits in Admiralty Act acts as a direct limitation to the court's jurisdiction in an action such as this one, the government challenge to the timeliness of these libels was properly raised by exceptions and exceptive allegations. United States Shipping Board Emergency Fleet Corporation v. Rosenberg Bros. & Co., 1928, 276 U.S. 202, 214, 48 S.Ct. 256, 72 L.Ed. 531; Levine v. United States, D.C.S.D. N.Y.1953, 115 F.Supp. 58, affirmed 2 Cir., 1954, 210 F.2d 954. A reasonable interpretation of section 745 coupled with the facts in these cases indicates that "causes of action" arose far more than two years before the institution of these libels — much closer to a decade prior to suit. Libelants, therefore, are under a duty to "allege sufficient facts to show affirmatively that the suit(s) (were) timely brought, otherwise * * exception(s) to the libel(s) must be sustained." Levine v. United States, supra, 115 F.Supp. at page 60. Appellants attempt to carry this burden by pointing to Clause 13 of the later charter forms, "Shipsalesdemise 303."
 
 
 15
 Plaintiffs argue that Maritime contracted, in Clause 13, to refund all "overpayments * * * as may be required" at the time of final audit. These "overpayments," it is contended, include those connected with the allegedly illegal rate of charter hire. The charterers claim that there was no breach of this contractual duty until Maritime disallowed their claims after final audit — and that a "cause of action" arose then. Appellants' alternate theory is that, regardless of whether it can be said that Clause 13 gives them a "contract" claim arising at the time of final audit, actions for unjust enrichment were timely brought because Clause 13 and later governmental action postponed the date for the running of the statute of limitations until after the final audits.
 
 
 16
 Clause 13, as quoted above, contains no particulars as to what kinds of issues were to be raised at time of final audit; the provision merely speaks broadly of "overpayments." As a matter of pure contract construction, it would be quite difficult to find that a broad, unspecific provision like that found in Clause 13 was a contract to refund, far in the future, payments which should prove illegal (the trial of that issue likewise to be postponed until a dimly future date). That it was an agreement to postpone the running of the time-bar on the illegality claims is an equally strange construction. It is difficult to understand why any government agency would make such an agreement. By the appellants' own contention, the dispute concerning illegality was completely crystallized before they signed the charters; there was no chance of later events varying the statutory authority, or lack of authority, of Maritime to insist on such a provision at the effective dates of the bareboat charters. The practical effect of construing Clause 13 in that manner would be to sanction the "depositing" of huge "overpayments" with the government, which deposits might be accruing an absolutely safe return of interest dependent on the outcome of law suits not even instituted until almost a decade later. Since the controversy was already ripe at the time of execution of the charters (or at least very nearly so), it is hard to imagine why the parties would then agree to "put it off" ten years. In the absence of more specific language than Clause 13 presents, it cannot be construed to be an agreement to repay, at time of final audit, overpayments based on the illegality of the rates — or as an agreement to delay the running of the time-bar for almost a decade.
 
 
 17
 Much is made of the difference in language between Clause 13 of "303" and the corresponding language of its prototype clause in the earlier Warshipdemiseout Form 203. The earlier form provided for payments by or to the government, upon final audit, as such audit showed to be due. Clause 13 calls for payments to the government as shown to be due by the audit, but provides for "such overpayments (to be) refunded to the Charterer as may be required." The literal language of the later provision would appear to limit payments to the owner after final audit to those shown by the audit to be due — while "overpayments * * * to the Charterer" are not to be so limited. It is argued that this phrasing reflects the intention of the parties to keep the illegality disputes open for the appellants until after final audit. While the wording of the clause might lend itself to such a construction, the result reached is much too heavy a burden to be borne by the rather innocuous phrase "as may be required." The postponement of such a dispute, already formulated and ready for decision at the time of execution of the charters — and possibly involving large sums of money — is an extraordinary provision. If the parties had truly intended such a result, they surely would have provided for it clearly and forcefully; it cannot be said that the language of Clause 13 does that.
 
 
 18
 Appellants contend that, contract construction aside, they have put forward enough evidence to show that the parties so intended Clause 13 to operate. This extrinsic evidence is offered to aid in the interpretation of the contract. It was apparently on this basis that the majority of the earlier in banc court held that appellants had made a sufficient prima facie showing on the time-bar jurisdiction question to warrant the denial of summary dismissal — and further proceedings in the District Court.
 
 
 19
 The charterers assert, by affidavit, their protests to the sliding rate of charter hire. They claim that, because of these protests, the paragraph of Clause 13 dealing with preliminary payments was inserted. The internal governmental handling of the monies, in an "Unearned monies" trust account, is hailed as of great significance. Finally, they lean on a smattering of letters between various of the ship operators and the comptroller division of Maritime as proving the intent to postpone all disputes, including those involving claims of illegality, until after final audit.
 
 
 20
 This extrinsic evidence purportedly proving intent is wholly unconvincing. As already stated, the phrasing of Clause 13 itself was a weak and ambiguous (and ineffective) way to reflect a postponement of the allegedly great disputes aroused by the protests of the ship operators. Clause 13, rather clearly however, does postpone the settlement of some claims to the time of final audit. In light of this, the trust fund handling of preliminary charter hire payments was wholly consistent with the basic structure of the auditing arrangements provided for in the charters. The inclusion of the illegality claims within the ambit of Clause 13's final paragraph can hardly be inferred from such treatment of the funds. The letters too are weak supporters of appellants' contentions. The exchanges pointed to are all in the period of the mid-1950's — around the time of the respective final audits and the institution of these libels. "Protests" at that time, long after all significant payments of additional charter hire had been paid, are self-serving and of little probative value. As far as the record advanced by the appellants reflects, there was a deep silence on the illegality question for eight full years. Moreover, the "admissions" claimed to have been made by Maritime are not at all established. Indeed, the letter from Maritime to Blidberg contains, if anything, a refutation of the charterers' contentions. The relevant portion of that letter reads:
 
 
 21
 "This office is aware of the questions raised by you with regard to the accountings on which the subject invoices are based; however, the provisions of the charter agreements are binding upon your Company to pay such amounts as were billed to you with the understanding that refunds will be made of any amounts determined through supplementary accountings, to have been overpaid."
 
 
 22
 Such reference to "supplementary accountings" cannot fairly be interpreted to refer to the illegality claims.
 
 
 23
 The appellants also advance the contention that their libels should not be dismissed at this stage in the proceedings because it precludes them from use of the otherwise available discovery mechanism. They claim that there is much material in the hands of the government, obtainable through Admiralty Rule 32, 28 U.S.C., which might shed further light on their contention that Maritime "intended" to put off until after final audit the disposition of the disputes over allegedly illegal charter rates and split-1947 accounting. They assert that discovery proceedings in a suit before the Court of Claims has already helped unearth an important "admission" by governmental agents. Although this contention might raise serious questions concerning an apparent clash between the summary disposition usually accorded in cases where the United States pleads, by exception, the jurisdictional time-bar, United States Shipping Board Emergency Fleet Corporation v. Rosenberg Bros., supra, Levine v. United States, supra, and the benevolent procedural ends usually served by modern federal discovery processes, 4 Moore ¶¶ 26.02, 26.03, we need not reach this issue.
 
 
 24
 It is, in our view, immaterial whether the parties "intended" to put off for a decade suit on the illegality claims. Congress waived governmental immunity from suit in this area in the Suits in Admiralty Act, but only for a two year period. Institution of an action within the statutory period is a condition precedent to the court's jurisdiction. Osbourne v. United States, supra, Desmond v. United States, supra. The executive arms of the government, through which the United States does business, have no more power to extend by contract the limited right granted by Congress than they had to create the original right of suit against the sovereign. This fact cannot be affected by the argument that the two year period is left intact — that merely the running of that limitations period is postponed for almost ten years; the results are identical in substance.
 
 
 25
 This does not mean that governmental contracting agencies are completely precluded from agreeing to "final audit" clauses like Clause 13 of these bareboat charters. But the type of controversies "put off" must involve possible future disputes — those which, because of the accounting give-and-take accompanying this kind of charter arrangement, would present a measure of doubt concerning the exact time when a "cause of action" arose. That sort of arrangement would not do violence to the Congressionally imposed built-in limitation; the deliberate postponing for ten years the trial of a clear and presently existing controversy most certainly would subvert the legislative scheme of a limited waiver of immunity. This is equally true whether the extension of time is interpreted so as openly to postpone the running of the limitations period — or whether the executive agency "contracts" to refund overpayments at a time in the distant future, dependent upon the outcome of law suits brought at that later date on a claimed breach of the agreement to refund.
 
 
 26
 The applicability of the timebar is different as regards the second broad class of controversies, those concerning disputed interpretation of the terms of the charters themselves. It would be impossible to say that a cause of action existed concerning these claims at any time during the active lives of these charters. Indeed, Maritime did not even publish its Accounting Regulations for these charters until early in 1950 — at which time not only virtually all of the vessels covered by the charters had been returned to the government, but also the greatest percentage of the preliminary payments had been made. There is at least some doubt as to the finality of those Accounting Regulations and it appears there was a good bit of contention back and forth concerning disputed items. Furthermore, a fair reading of Clause 13 would indicate that the settlement of some disputes was meant to be postponed until after preliminary statement or final audit, at which time the respective positions of the contending parties would be clear. It must have been these "contract claims" referred to.
 
 
 27
 Clause 13 was an effort to postpone final determination of accounting or auditing disputes, that is, the proper interpretation of the contract terms as to whose legality there was no dispute. It appears to be an effective means to that end, for under its machinery there is no actual controversy until the charterer's credits are disallowed on the final accounting, or refund is refused when demanded on preliminary statement. Rulings and preliminary payments are tentative up to that point.
 
 
 28
 The lack of power in Maritime to "extend" the Congressional limitations period does not apply with such force on these disputes over contract interpretation. Due to the intricate nature of steamship charter accounting problems, final settlement of the bareboat charter accounts had to be postponed far into the future. Final figures on such items as capital employed, expenses — and, therefore, profits — could not be ascertained until ultimate settlement or disposition, long after redelivery of the vessels, of outstanding foreign agency accounts, personal injury claims and the like. Within this framework of a necessarily suspended final accounting, it was permissible for Maritime to agree to put off for later determination the validity of the opposing views on the correct interpretations of the charters at least until either the charterer in preliminary statement, or owner in final audit set forth its claims. By February 21, 1950 Maritime described the procedures to be followed in computation and payment by the charterers. 46 C.F.R. § 299.39ff. Apparently, accountings and supplementary accountings were constantly being submitted to Maritime for approval. It may be that unlike the "illegality" disputes, Maritime never made a firm and final stand on these questions until the issuance of the final audits. However, the right to recover overpayments came into existence at least at the time of the charterer's preliminary statements. Clause 13 and the Regulations plainly contemplated the preliminary statement of charterers' claims by annual and final accountings. The claims involving contract interpretation are time-barred two years after the filing of each preliminary statement. If such statements were not filed upon annual or final accounting under the regulations, the controversy might be postponed to each final audit. It does not appear that, at least after February 1950, any of the charterers omitted to make the preliminary statements contemplated, although such a possibility may exist.
 
 
 29
 The charterers argue that, even though the "illegality" claims be subject to the time-bar, they still have a right to maintain actions for refund of allegedly illegal exactions paid on additional charter hire within two years of the filing of the libels. The District Courts held, on the authority of Sword Line, that such payments were "voluntary" and therefore unrecoverable. Appellants first contend that they were denied a hearing on the question of "voluntary payments." The government nowhere pleaded the voluntary payment issue in its exceptions and exceptive allegations and appellants first realized the issue was in these cases (at the preliminary stage) when their libels were dismissed. They insist they are entitled to a hearing and a chance to introduce evidence refuting the "voluntariness" of the payments.
 
 
 30
 Appellants' protest does seem at first glance to have substance, for if there is a genuine issue as to voluntariness they are entitled to be heard on it. In all their presentation, however, they point to nothing which would weaken the basis for the ruling of voluntary payments of the amounts now claimed to have been illegally exacted. After the return of the vessels there was no duress. Since the libelants then knew that from their own standpoint they were illegally exacted, the payments must be classed as "voluntary" payments not recoverable in an action against the United States. United States v. Edmondston, 1901, 181 U.S. 500, 21 S.Ct. 718, 45 L.Ed. 971; Union Pacific R. R. Co. v. Dodge County Com'rs, 1878, 98 U.S. 541, 543-544, 25 L.Ed. 196; Silliman v. United States, 1879, 101 U.S. 465, 470, 25 L.Ed. 987; Cunard SS Co. v. Elting, 2 Cir., 1938, 97 F.2d 373, 377.
 
 
 31
 The record in the instant cases falls far short of a showing that the payments of additional charter hire up to 90% of profits were made under protest. In all of the tax cases relied on, there was a clear protest made accompanied by a specific reservation of rights. In the cases at bar, appellants point mainly to Clause 13 and their "general" protest before signing the charters in 1946. Since Clause 13 does not effectively reserve the illegality question for final audit, it cannot serve as a "reservation of rights" so as to make the post-redelivery payments "nonvoluntary"; and surely the protest in 1946, overridden when the charterers accepted the charters containing Maritime's sliding charter hire scale does not serve as a protest for each subsequent overpayment. The letters between the charterers and Maritime in the middle 1950's are also unconvincing. (During the eight year silence, apparently, all significant payments were made — before appellants ever "protested" again.) The exchange of letters between Blidberg and Maritime containing the protest by the former and the urging to pay by the latter followed by more than a year Blidberg's last payment on additional charter hire.[10] The protest by Norgulf was in its letter to Maritime of July 1, 1954. Its last payment on additional charter hire was made in August of the preceding year. It is perhaps particularly significant that to Maritime's request, in January of 1955, that Norgulf pay a sum of $125,778.84 to the government and then later sue for its recovery, Norgulf has turned a deaf ear. It would appear that all of the shippers' protests (which, on the record, are exceedingly sparse considering the host of libelants now before the court) were after the fact, belated attempts to reraise their old protests of illegality. Similarly, any assurances made by agents of Maritime seem irrelevant in view of the fact that no reliance seems to have been placed on them.
 
 
 32
 We do not consider these as mutual accounts, open until the last item on either side of the ledger is entered. They are essentially one way, the hire of ships by the charterers and payment of the terms of hire. There is no corresponding hire or sale or furnishing of services by the charterer to the owner. Adjustment of such a transaction by credit for stores and fuel appurtenant to the vessel at the time and place of its return to the owner on termination of the charter does not change the essentially one-directional nature of the transaction.
 
 To recapitulate:
 
 33
 1. The claims to recover allegedly illegal payments, based on the sliding scale profit-sharing and on the split-year accounting in 1947 by reason of the foreign trade addendum are outlawed by the statute of limitations on payments made more than two years before suit, and barred from recovery as voluntary payments if made thereafter.
 
 
 34
 2. All claims not based on additional charter hire founded on payments made more than two years before suit are outlawed by the statute of limitations.
 
 
 35
 3. Claims for adjustment of additional charter hire, based on contract interpretation rather than on claims of illegality, are not outlawed if suit was brought within two years of preliminary statement or final audit, whichever was earlier.
 
 
 36
 The court adopts the disposition of the Blidberg claim for "latent defects" made by Judge Hincks on the previous rehearing in banc, 265 F.2d at page 148.
 
 
 37
 The appeal of Dichmann, Wright & Pugh, Inc., is dismissed.
 
 
 38
 The judgment in No. 24190, American Foreign Steamship Corp. v. United States of America is affirmed.
 
 
 39
 The judgment in No. 24400, Blidberg Rothchild Co., Inc. v. United States of America is affirmed.
 
 
 40
 The judgment in No. 24284, Polarus Steamship Co., Inc. v. United States of America is affirmed.
 
 
 41
 The judgments in No. 24401 and No. 24402, Fall River Navigation Co. v. United States of America are affirmed.
 
 
 42
 The judgments in No. 24200, Stockard Steamship Corp. v. United States of America, No. 24285, A. L. Burbank & Co. Ltd. v. United States of America, No. 24286, T. J. Stevenson & Co., Inc. v. United States of America, No. 24287 and No. 24289, North Atlantic and Gulf Steamship Co. v. United States of America, No. 24291, A. H. Bull Steamship Co., Bull-Insular Line, Inc. and Baltimore Insular Line, Inc. v. United States of America, No. 24292, New York and Cuba Mail Steamship Co. v. United States of America, and No. 24288, Luckenbach Steamship Co., Inc. v. United States of America, are reversed and remanded for further proceedings in accordance with this opinion to determine whether or not and to what amount valid claims exist on behalf of the libelants against the United States under the charters in suit.
 
 
 
 Notes:
 
 
 [1]
 Judge Palmieri, in an opinion reported in 1956, 141 F.Supp. 58, dismissed all of these libels except those involving Blidberg Rothchild Co., Inc., and Fall River Navigation Company. Judge Herlands dismissed the libels concerning those companies in an unreported memorandum cited verbatim in American-Foreign Steamship Corp. et al. v. United States, 2 Cir., 1957, 265 F.2d 136, at page 140, footnote 2
 
 
 [2]
 Present Chief Judge Lumbard at that time, as now, disqualified himself because of prior contacts with the cases during his tenure as United States Attorney for the Southern District of New York
 
 
 [3]
 All charterers save Luckenbach press claims based on the sliding scale for additional charter hire
 
 
 [4]
 Pressed by Blidberg, Burbank, Luckenbach and Norgulf
 
 
 [5]
 Blidberg, Bull, Burbank, Luckenbach, New York & Cuba Mail and Norgulf
 
 
 [6]
 Asserted by Polarus
 
 
 [7]
 By Blidberg
 
 
 [8]
 By Blidberg
 
 
 [9]
 By Bull
 
 
 [10]
 Blidberg's protest letter is dated April 28, 1954; Maritime's letter urging payment December 30, 1954. Subsequently, between January 10 and August 19, 1955, Maritime set off against Blidberg's account $17,725.00 for additional charter hire. This sum was later returned. Blidberg's last previous payment on additional charter hire was on March 30, 1953
 
 
 
 43
 CLARK, Circuit Judge, with whom WATERMAN, Circuit Judge, joins (concurring in part and dissenting in part).
 
 
 44
 The libelants here necessarily assume the task of showing that the parties to these uniform ship charters fully intended by their agreements to change the normal time when a claim for overpayment accrues — i. e., at the time of overpayment — to a later date in the remote and indefinite future. In his opinion Judge Smith gives a masterly demonstration of what wholly unusual contracts these would be for any government official to make under the circumstances, and of how inadequate the language of the famous Clause 13 is to warn the contractors of what they were (on this interpretation) so strangely doing. The disputes had already arisen before the contracts were made, and they called for large charter hire payments to be made to the government almost immediately. That settlement of these already ripe disputes was to be postponed until all the claims the parties might eventually think of were not only presented, but finally adjusted, would have the government holding the bag at high interest rates for many years or until the claimants were completely satisfied. Actually nearly a decade was consumed before action was instituted, and the matter is not yet settled after another third of a decade of litigation. Such a prolonging of the adjustment of government claims, in an area where the statutes show time to be of the essence, would need to be clearly suggested by contract language and background before it could be accepted. But that quite clearly is not the case here; neither the language nor the inconclusive background brings this out; nor, notwithstanding the suggestion of remand and further hearing first conceived by the former panel, are we given any intimation of any other material which may change the obvious conclusion. For the very inconclusive nature of all this supports Judge Smith's demonstration that the unusual interpretation urged by libelants cannot be considered a reasonable one.
 
 
 45
 But even though Judge Smith's conclusion is negatively complete, we find difficulty in his affirmative holding finding a distinction between claims for overpayment of additional charter hire based on alleged illegality and those based on interpretation of the contracts with respect to allowances to be made for such matters as capital employed, overhead expenses, agency fees, and so on. This distinction is not illogical if the parties had chosen to make it. We discover no basis for it, however, in what they did or said. And acceptance of it weakens the grounds for what we believe to be the more reasonable over-all construction of Clause 13, viewed not in isolation as our brothers tend to do, but as a natural, though not overriding, part of this many paragraphed document. Thus viewed we find the reference to "the completion of each final audit by the Owner" (italics added) to concern the additional profits made in each "calendar year" and to be accounted for yearly, as the first part of Clause 13 makes clear. (This part is not quoted in the opinion herewith, but does appear at 2 Cir., 265 F.2d 145, note 3, as well as the dissent herewith.) Hence the proviso of Clause 13 here in issue is a natural corollary of the charge thus levied for additional charter hire on the net profits shown at the end of each calendar year; additionally it avoids the obvious difficulties found in the other interpretations advanced. So after further careful study we reaffirm the interpretation we previously made, as set forth in our opinion at 2 Cir., 265 F.2d 150-152, from which we now quote salient portions:
 
 
 46
 "Turning now to Clause 13 itself — quoted in full in the opinion — it should be noticed that it is not a provision for claim adjustment; nor does it in any way suggest that it was meant to deal with the processing of claims for refund. Clearly it is what it is labeled as being, namely, a provision for `Additional Charter Hire.' It follows naturally after Clause 12, covering `Basic Charter Hire,' and in its main section provides a scale for such additional hire based on cumulative net voyage profits of the charter in any calendar year. The emphasis on yearly accountings is obvious. The particular provisions here in issue come at the end and deal with preliminary and final payments of such additional charter hire, based on the scale stated. So a method is provided whereby the government can ask and receive preliminary payments as the money is earned, and the `final audits' clearly refer to the yearly settlements thus made necessary. Quite simply they are necessary because the progressive rate of additional hire depends on the amount of cumulative profits for the year. They just do not fit the concept of an ultimate and probably long delayed settlement of all disputes which might conceivably arise under any of the manifold provisions of these extensive charters. Significantly a much later charter provision does look to such possibility, thereby affording a persuasive contrast. For Clause 28 deals with `Accounting, Report and Supervision' and requires the keeping of books, the filing of financial statements, and the like, covering all transactions, while it also authorizes the auditing of all books and the maintenance of checks and controls of expenditures and revenues in connection with the operation of any of the chartered vessels. [But it contains no provision postponing the accrual of claims.]
 
 
 47
 "In the final paragraph of Clause 13 the preliminary statements therein referred to are correlated with the final audit. This places a well-nigh insuperable obstacle in the way of the interpretation claimed by libelants. For the `adjustment' visualized is to be had `either at the time of the rendition of preliminary statements or upon the completion of each final audit by the Owner'; the idea is carried further thus, `at which times such payments will be made to the Owner as such preliminary statements or final audit may show to be due, or such overpayments refunded to the Charterer as may be required.' Each final audit therefore serves a function of settling the payments due on each calendar year's profits. Thus it fits properly with the rest of the clause. It cannot be made to mean some final settlement of all and sundry differences a decade or more hence when at length both parties are prepared to have a balance struck. Thus the government's brief is correct in saying: `Thus the charterers' right to file a claim for adjustment and refund of an overpayment of additional hire and to bring immediate suit if refund was not made is precisely the same at the time of a charterer's rendition of its preliminary accountings and at the time of the owner's final audit.'
 
 
 48
 "This natural construction is supported by various Maritime Administration regulations which (1) require the charterer at the end of each calendar month to pay 90 per cent of the additional charter hire then indicated to be due, 46 CFR 299.31(k) (1); (2) provide that such payments are preliminary and subject to adjustment upon completion of audit by the government covering the period involved (the calendar year), id.; (3) provide that tender of the monthly payments and their acceptance do not prejudice rights under the charter or otherwise, id.; (4) require remittance of monthly payments to be accompanied by a preliminary statement, 46 CFR 299.31(k) (2); (5) provide that if this statement indicates that 90 per cent of the cumulative total for the expired portions of the periods involved (calendar year) is less than the total of payments theretofore made for the period, the charterer may apply for a refund, 46 CFR 299.31(k) (5); and (6) require each charterer to submit a separate final accounting of additional charter hire for each annual or over-all accounting period [which under 46 CFR 299.37-1(h) and (i) is defined as a calendar year or a period less than a calendar year, 46 CFR 299.37-2(b)]. Hence, simply put, Clause 13, read with the regulations, provides that the charterers must make monthly payments on account of the additional charter hire which are preliminary because only upon the rendition of preliminary statements or upon final audit for the year will the parties know whether or not the amounts of the monthly payments were correct.
 
 
 49
 "Neither in wording nor in practical operability, however, is the Clause appropriate for the adjustment of the type of `overpayment' here involved. For the charterers knew that as they read the law the sums here claimed were not correct even when remitted. So there is no suggestion anywhere in the contract that the earlier language in Clause 13 bears on these `overpayments' in any way. Nor is there any suggestion in Clause 13 or in the regulations that the preliminary payments are tentative because the charterers believed the Clause to be illegal or that the parties agreed to put off a judicial determination of the legality of the rates. It is a strange contract which would preclude suit by the charterers to reform the contract or to recover the specific monthly `overpayments' if actually illegal. But, as the opinion herewith makes clear, libelants to succeed must rely on such an interpretation, viz., that the phrase `each final audit' can mean only some type of closingout accounting which ultimately and finally terminates all relations between the charterers and the United States. I submit with all deference that the mere statement of the argument betrays its weakness; without fairly conclusive support somewhere for such a reading there is no `prima facie showing of jurisdiction.' Surely the parties did not intend an agreement to require the deposits of huge sums of money for an indefinite time pending determination of the legality of the contract rates. For quite clearly the period of limitation can start only when the parties agree and are content that they have eventually obtained an ultimate closing-out accounting. Ironically enough, since even late deposits are to be included, there is nothing to prevent the charterers from continuing to make the government a good and safe depositary, paying better than market rates of interest, for their excess funds. Hence for my part I cannot accept this as permissible interpretation against respondent's persuasive showing (wholly consistent with both the charters and the regulations) that `each final audit' means an audit of the charterers' yearly profits."
 
 
 50
 Therefore we concur in the decision of Judge Smith, except for his direction in the case of eight of the libels that the orders be reversed and the actions be remanded for further hearing; as to these also, we vote to affirm the orders of dismissal. It appears, however, that our brethren are in disagreement as to the extent of the remand thus ordered; upon this limited issue we agree with Judge Smith that the remand should not be more extensive than he directs.
 
 
 51
 FRIENDLY, Circuit Judge, with whom LEONARD P. MOORE, Circuit Judge, joins (dissenting).
 
 
 52
 It would have been a happy circumstance if the changes in the membership of the Court since these cases were last before us had led to concord or at least to a closer approach to it. Instead they have resulted in replacing the former 3-2 vote for reversal with a 3-2 vote which, broadly speaking, is for affirmance, — plus a fine opinion by our brother Smith which we applaud for its exposition of the issues, even though we are unable to pay it the ultimate tribute of agreement. Because of his fresh and somewhat different analysis, something more needs be said in the way of an expression of dissent than merely echoing Judge Hincks' opinion for Judges Medina, Moore and himself on the previous in banc, 265 F.2d 136, with which we agree.
 
 
 53
 Understanding of Clause 13 of Shipsalesdemise 303 necessitates a statement of the controversy whence it stemmed, which, if not different from Judge Smith's in the ultimate, places the emphasis where required. The Act of March 8, 1946, 60 Stat. 41, 50 U.S.C.A. Appendix, §§ 1735-1746, had provided both for the sale, § 1737, and, in certain cases, § 1738, for the charter of war surplus vessels. Section 5(b), 50 U.S. C.A.Appendix § 1738(b), provided that the charter hire "shall be fixed by the Commission at such rate as the Commission determines to be consistent with the policies of this Act * * * but, except upon the affirmative vote of not less than four members of the Commission, such rate shall not be less than 15 per centum per annum of the statutory sales price (computed as the date of the charter)." With a certain exception not here material, "rates of charter hire fixed by the Commission on any warbuilt vessel which differ from the rate specified in this subsection shall not be less than the prevailing world market charter rates for similar vessels for similar use as determined by the Commission." Section 5(c) made applicable "to charters made under this section" various sections of the Merchant Marine Act, 1936; one of these, § 709(a), 46 U.S.C.A. § 1199(a), had required "Every charter made by the Commission" to include a clause requiring the charterer to pay over to the Commission as additional charter hire "one-half of such cumulative net voyage profit in excess of 10 per centum per annum" on the charterer's capital employed in operating the chartered vessels. Charters previously made by the War Shipping Administration contained such a 50% clause, 11 F.R. 4669, 4671 (1946).
 
 
 54
 Announcement by the Commission in August, 1946, that it intended to cancel the War Shipping Administration Warshipdemiseout 203 charters and substitute a new form of charter Shipsalesdemise 303, with a sliding scale reaching as high as 90% of net profits, naturally led to protest from the operators on both business and legal grounds. The protest clearly was not lacking in legal substance, as shown by the recent decision of the Court of Claims, Madden, J., dissenting, American Export Lines, Inc. v. United States, 1961, 290 F.2d 925, that the new sliding scale went beyond the Commission's legal powers. The meager record available on the exceptions and exceptive allegations on the libels tells us only that "on September 4, 1946, the Maritime Commission rejected the protest of the ship operators * * * but adopted the recommendation of its General Counsel that the clause of the proposed charter party containing the disputed item, i. e., Clause 13, be modified" in a way we shall now describe.
 
 
 55
 What the operators' protest achieved, as well as what it did not, can best be understood by setting down in parallel columns the relevant provisions of Clause 13 of the previous Form 203 and of Form 303 as issued:
 
 
 56
 Form 203. Form 303.

 "Clause 13. Additional Charter "Clause 13. Additional charter
 Hire. After redelivery of all Vessels hire. If at the end of the calendar
 under this Agreement, if the cumulative year 1946, or any subsequent calendar
 net voyage profits computed for year or at the termination of this
 the period of the agreement (after Agreement, the cumulative net voyage
 the payment of the basic charter hire profit (after the payment of the
 provided herein and payment of the basic charter hire hereinabove specified
 Charterer's fair and reasonable overhead and payment of the Charterer's
 expenses applicable to operation fair and reasonable overhead expenses
 of the Vessels) shall be in excess of a applicable to operation of the Vessels)
 rate of ten (10) per centum per annum shall exceed 10 per centum per annum
 on the Charterer's capital necessarily on the Charterer's capital necessarily
 employed in the business of the employed in the business of the Vessels
 Vessels during the period of the (all as hereinafter defined), the
 agreement (all as hereinafter defined Charterer shall pay over to the Owner
 in Clause 23) the Charterer shall pay at Washington, D. C., within 30 days
 to the owner at Washington, D. C. after the end of such year or other
 within sixty (60) days thereafter, an period, as additional charter hire for
 amount equal to one-half of such cumulative such year or other period, an amount
 net voyage profit in excess equal to the percentages of such cumulative
 of an amount computed for the period net voyage profit in excess
 of the agreement at the rate of ten of 10 per centum per annum on such
 (10) per centum per annum on such capital computed in accordance with
 capital as hire in addition to the hire the following table (but such cumulative
 payable under Clause 12; Provided, net profit so accounted for shall
 however, That such payment of additional not be included in any calculation of
 charter hire shall be deemed to cumulative net profit in any subsequent
 be preliminary and subject to adjustment year or period):
 upon the completion of final audit "Cumulative net voyage profit (in
 by the Owner, at which time such excess of 10% per annum on capital
 payments will be made by or to the necessarily employed) not in excess of
 Owner as such final audit may show $100. per day, 50%.
 to be due." "Cumulative net voyage profit (in
 excess of 10% per annum on capital
 necessarily employed) in excess of
 $100. per day but not in excess of
 $300. per day, 75% on such excess
 over $100. per day.
 "Cumulative net voyage profit (in
 excess of 10% per annum on capital
 necessarily employed) in excess of
 $300. per day, 90% on such excess
 over $300. per day.
 "The Charterer agrees to make preliminary
 payments to the Owner on
 account of such additional charter
 hire and on account of any additional
 charter hire accrued under any War
 Shipping Administration Form 203
 (Warshipdemiseout) charter (prior to
 the times of payment provided for
 
 
 57
 above or in such Warshipdemiseout
 charters) at such times and in such
 manner and amounts as may be required
 by the Owner: Provided, however,
 That such payment of additional
 charter hire shall be deemed to be preliminary
 and subject to adjustment
 either at the time of the rendition of
 preliminary statements or upon the
 completion of each final audit by the
 Owner, at which times such payments
 will be made to the Owner as such preliminary
 statements or final audit
 may show to be due, or such overpayments
 refunded to the Charterer
 as may be required."
 
 
 58
 For the purpose here material Form 303 differed from Form 203 in two important respects. First, it permitted the Commission to call for payments of additional charter hire or the charterers for refunds "at the time of the rendition of preliminary statements," as well as on final audit.[1] Second, instead of providing that "payments will be made by or to the Owner as such final audit may show to be due," it provided that payments will be made to the Owner as the statements or audit show to be due, — note only "to" and not "by" — "or such overpayments refunded to the Charterer as may be required." The latter is the vital phrase. It shows the charterers were not satisfied that the Owner agree to make such payments to them as the statements or audit "may show to be due," as had been provided in form 203; they demanded that the Owner agree to refund "such overpayments * * * to the Charterer as may be required." Why the change? Quite obviously, it would seem, because the charterers insisted that the Owner agree to refund something which the statements and audits would not "show to be due" — namely, the overpayments resulting from what the charterers considered an invalid provision in the contract itself. This is the concession which the Charterers got from their protest — and of which the majority would now deprive them.
 
 
 59
 Perhaps "quite obviously" goes too far, since our brothers do not read the clause as we do. We have used the phrase because that interpretation accords with business sense and with the apparent understanding of the parties (see the Maritime Administration's notice of May 14, 1951, mentioned below and its letters fn. 3), and no one has suggested any other reason for the change. At the very least, however, libelants made a sufficient case that the contract obligated the Owner to refund charter hire illegally collected, "either at the time of the rendition of preliminary statements or upon the completion of each final audit," that they ought be permitted to offer extrinsic evidence in support of their construction, 3 Corbin, Contracts (1960 ed.), § 579, with the important aid of discovery of the Commission's files, rather than be foreclosed by a decision on the pleadings and on affidavits which prick the mind rather than satisfy it — a method for determining such an issue which another Court of Appeals sitting in admiralty has soundly condemned, Richfield Oil Corp. v. United States, 9 Cir., 1957, 248 F.2d 217, 225, as have this and other courts in a not unrelated procedural area, see 6 Moore, Federal Practice (1953 ed.), ¶ 56.15 and ¶ 56.16.
 
 
 60
 Indeed, the majority seem to recognize the force of these considerations when they say that exploration of what the parties actually intended would be fruitless since if Clause 13 postpones the accrual of a claim as libelants say, this would go beyond the Commission's contracting powers. Without debating whether the "jurisdictional" character commonly attributed to what would seem an ordinary statute of limitations in the Suits in Admiralty Act, 46 U.S.C.A. § 745, is not an anachronistic carry-over from doctrines of sovereign immunity now generally abandoned, we find neither reason in nor authority for the position that this statute constitutes an implied but universal limitation on the power of government contracting agencies to draw their contracts as they deem best. Section 207 of the Merchant Marine Act, 1936, 46 U.S.C.A. § 1117, which was expressly made applicable to activities under the Act of March 8, 1946, § 12(d), 50 U.S.C.A.Appendix, § 1745(d), authorized the Commission to "enter into such contracts, upon behalf of the United States, * * * as may, in its * * * discretion, be necessary to carry on the activities authorized by this chapter * * in the same manner that a private corporation may contract within the scope of the authority conferred by its charter." The Commission may have had excellent reasons for agreeing to purchase peace by a modification of Clause 13 which, by assuring the charterers ample time to protect their alleged rights, would get the charters signed and keep the ships at sea. Perhaps the Commission was just as well satisfied on its own account to avoid immediate test of its powers. The whole issue might become academic — no one could know in 1946 whether the cumulative net profits would, in fact, exceed 10% on capital. Moreover, the Commission may have had in mind the possibility of obtaining validating or, on its view, clarifying legislation from a future Congress; it might well have thought pending litigation would be an obstacle to this in view of Congressional reluctance to intervene in matters already pending in the courts. In any event, all this was for the Commission to decide; it is of no moment that, in the light of hindsight, we may think its decision to modify Clause 13 to have been unwise. As was said of another officer of government, "we do not find in the statutes defining the powers and duties" of the Commission "any such limitation on the exercise of his discretion as this contention involves. His authority to make determinations includes the power to make erroneous decisions as well as correct ones." Swift & Co. v. United States, 1928, 276 U.S. 311, 331-332, 48 S.Ct. 311, 317, 72 L.Ed. 587. We are thus quite unable to join with the majority in attributing to the Suits in Admiralty Act, enacted in 1920, so restrictive a force on the contracting powers of agencies created long afterward and endowed by Congress with the same power of molding their contracts as private corporations enjoy.
 
 
 61
 If we are right in thinking that Clause 13 gave the charterers a contractual right to recover any overpayment, even for illegality, "at the time of the rendition of preliminary statements or upon the completion of each final audit," or that the charterers are at least entitled to offer parol evidence that it did, we need not tarry over either of the first two dates when our brother Smith thinks the cause of action for the allegedly illegal payments may have arisen, immediately on signature, since, as he holds, an action for a declaratory judgment, 28 U.S.C.A. §§ 2201, 2202, could then have been brought, or upon the first payment exceeding 10%, — although we must express our doubts as to how the date when a "cause of action arises" under the Suits in Admiralty Act of March 9, 1920, 46 U.S.C.A. § 745, can have been accelerated by a new procedural device, enacted fourteen years later, Act of June 14, 1934, c. 512, 48 Stat. 955, whose framers surely had no such thing in mind, and our fears as to the traps for the unwary that would be set if courts were to adopt a general doctrine that causes of action arise as soon as declaratory relief becomes obtainable.[2] An obligee who has been assured that money erroneously exacted from him will be refunded at a later date is not required to sue before then, even though he may. His causes of action for declaratory relief or for money unjustly demanded may be timebarred if he does not sue within the statutory period after these accrue, but his cause of action for breach of contract does not arise until the obligor's performance is due; and he is free to rely on that cause of action and abandon the others.
 
 
 62
 This brings us to what we regard as the most serious issue in the case — did libelants' contractual claims for refund arise seriatim "at the time of the rendition of preliminary statements" or could libelants await final audit? The majority simply assume the former, insofar as they deal with the issue at all.
 
 
 63
 We do not deny that libelants could have begun suits for refunds of what they considered additional charter hire illegally exacted, when they rendered preliminary statements. However, it does not necessarily follow they were required so to bring them, under pain of time-bar. The application of the statute of limitations to contracts where a promisee is entitled to periodic performance is a troublesome question, discussed in 6 Williston, Contracts (Rev. ed.), §§ 2024-2028, and in 3A and 4 Corbin, Contracts (1960 ed.), §§ 687, 698, 948-51. The cases fall into two lines. One is illustrated by decisions that the statute runs separately against each instalment of a debt, as, for example, against each right to collect interest on bond coupons, Amy v. City of Dubuque, 1879, 98 U.S. 470, 25 L.Ed. 228, or against each instalment of salary under a contract of employment, Gensman v. West Coast Power Co., 1940, 3 Wash.2d 404, 101 P.2d 316. See cases cited in Annotation, 82 A.L.R. 316. On the other hand, if the contract calls for the payment of an entire sum for a specified overall performance, with the right to collect advance payments, as in the case of progress payments to a contractor, City of Albany v. Leftwich, 5 Cir., 1928, 24 F.2d 297, certiorari denied 1928, 277 U.S. 599, 48 S.Ct. 561, 72 L.Ed. 1008; Rich v. Arancio, 1931, 277 Mass. 310, 178 N.E. 743, or payments to an attorney retained in connection with a single litigation, Walker v. Goodrich, 1855, 16 Ill. 341, the obligee may safely wait until the entire sum is due and sue for that without fear of the statutory bar on the earlier instalments. A decision somewhat analogous to the instant case is Board of County Commissioners of Wilson County v. Hudson, 1936, 143 Kan. 454, 54 P.2d 994. This involved a two year printing contract, with the printer submitting to the county an itemized monthly bill; the court held the county's suit to recover overcharges, brought within the statutory period after the termination of the contract, was timely as to all months although the period had elapsed as to many individual payments.
 
 
 64
 The instant case falls within the second line of decisions. The very language of the contract "preliminary and subject to adjustment" seems to negative an intention to require litigation before the final audit. Consistently with this, the Maritime Administration sent all charterers, on May 14, 1951, a notice requesting that checks submitted with preliminary accountings should bear no restrictive legends but rather should be accompanied by a letter of transmittal stating "that the remittance is on account of additional charter hire due the Maritime Administration and is subject to adjustment upon the completion of final accounting between the Charterer and the Maritime Administration and that neither the tender of such payment by the Charterer, nor its acceptance by the Maritime Administration shall be construed as an approval of the correctness of the amount thereof, nor as a waiver of the rights or remedies of either party under the terms of the agreements involved or otherwise." The amount of additional charter hire due for any period could be substantially changed by subsequent accounting adjustments; it might even be eliminated if libelants are right in their belief that subsequent deficiencies in rate of return may be applied to reduce excesses previously reported. If the Owner under these charters were a person not enjoying the Government's immunity from statutes of limitations, could a charterer successfully assert the Owner was barred from recovering amounts due on preliminary statements as to which the period had run, although suit was timely begun after final audit? We think not — and also that the rule works both ways.
 
 
 65
 Moreover, even if it were to be held that a sounder view of the law of limitations would require claims based on the illegality of the exactions to be asserted within two years of the respective preliminary statements rather than of final audit, the libels ought not be dismissed as to claims of that nature as to which suit was brought within two years of such statements; since libelants are suing on an express contract which validly postponed accrual of their causes of action at least that long, there is no need to show that such payments were "involuntary."[3] And on no view can we see any legitimate basis for holding that any of the claims which relate only to the amount of additional charter hire, assuming the contracts to be valid, are barred. Judge Smith does not doubt the power of the Maritime Commission to postpone determination of such claims, as he does with respect to the claims of illegality; hence the only question is how long determination was postponed. No one has suggested what purpose would have been served for anyone by a construction that would require a charterer to rush into the courts for the determination of the multitude of such claims, which Judge Smith recognizes to be bound to arise, on the submission of each preliminary statement, under pain of otherwise becoming time-barred. Happily, persons engaged in the performance of complex contracts have learned other ways of working out their differences than constant resort to the courts; they wait until all the disputed items are before them and then generally come to a conclusion no less satisfactory for not being altogether scientific. The law of limitations should encourage this sensible process of adjustment — not require immediate entry into the judicial arena under threat of the expiry of a short statutory bar.
 
 
 66
 We would therefore reverse the orders dismissing the libels[4] with instructions to permit the parties to offer relevant evidence as to the meaning of Clause 13 and to take further proceedings consistent with this opinion.[5]
 
 
 
 Notes:
 
 
 [1]
 We find it unnecessary to discuss the point, much argued in the opinions when the case was last before us, whether "final audit" means what it says or any annual audit, since Judge Smith very properly assumes the former. Form 303 used the phrase "each final audit" because there would be one for the Warshipdemiseout charter and another for the Shipsalesdemise charter. The practice under the charters shows clearly that the parties did not regard annual audits as the "final" audit; these were simply "preliminary statements."
 
 
 [2]
 The opinion cites no authority for this. It seems opposed to the majority rule in at least one analogous situation — namely, that title by prescription does not run against a remainderman until he can bring a possessory action even though a statute permitted him to bring an earlier action to quiet title. Maxwell v. Hamel, 1940, 138 Neb. 49, 292 N.W. 38; contra, Murray v. Quigley, 1902, 119 Iowa 6, 92 N.W. 869; see Developments — Declaratory Judgments, 62 Harv.L.Rev. 787, 831, fn. 331 (1949)
 
 
 [3]
 On our reading of Clause 13 there is no reason to speculate why the companies continued to pay the allegedly illegal charter hire after the ships were returned. However, it ill becomes the Government to urge this in view of its repeated demands that the charterers make the payments and rely on their right to refund on final audit. See letter of December 30, 1954 to Blidberg Rothchild Co.; letter of July 15, 1955 to James Griffiths & Sons, Inc.; letter of March 8, 1955 to North Atlantic and Gulf SS. Co., Inc. Moreover, the threat of "the placing of a government-wide set-off payment order," would seem a sufficient explanation, letter of December 30, 1954 to Blidberg Rothchild Co
 
 
 [4]
 This is subject to an exception for the Blidberg claim for "latent defects" as to which we join with our brothers in adopting Judge Hincks' disposition on the previous rehearingin banc, 265 F.2d at page 148.
 
 
 [5]
 Naturally this means that we join in so much of Judge Smith's opinion as reverses the dismissal of certain claims